**Marjorie Barstow GREENBIE, Plaintiff,**

**v.**

**Hollister NOBLE, Doubleday & Company, Inc., Sears Roebuck and Company, National Broadcasting Company, Inc., Batten, Barton, Durstine & Osborne, Inc., E. I. Du Pont De Nemours & Co. (Inc.), Foote, Cone & Belding, Inc. and Hallmark Cards, Inc., Defendants.**

United States District Court
S. D. New York.
April 3, 1957.

See also 18 F.R.D. 414.

71. See Exhibit #60.

Socolow, Stein & Seton, New York City, for plaintiff. Monroe E. Stein, New York City, of counsel.

Satterlee, Warfield & Stephens, New York City, for defendants Doubleday & Company, Inc. and Sears Roebuck & Co. James F. Dwyer, George C. Shively, New York City, of counsel.

LEVET, District Judge.

This is a suit for damages for copyright infringement brought pursuant to the Copyright Act, 17 U.S.C.A. § 1 et seq. Trial was before the Court without a jury. Plaintiff, Marjorie Barstow Greenbie, is the author of a book entitled, "My Dear Lady," which was published on October 7, 1940. It is alleged that one Hollister Noble, one of the defendants above named, infringed the copyright of the aforesaid book by writing and causing to be published in 1948 a certain book entitled, "Woman With A Sword." The defendant Noble died on or about the time of the commencement of this action, which was instituted on July 21, 1954. Noble was never served in this action and his estate has not been made a party. The action has been discontinued against all defendants except Doubleday & Company, Inc. and Sears Roebuck and Company.

Doubleday is alleged to have infringed plaintiff's copyright by publishing a general edition of "Woman With A Sword" and Sears by publishing a book club edition under license. The amended answers of Doubleday and Sears admit the publication but deny the allegations of infringement and assert a number of defenses including the propriety of plaintiff's status as a party to this action, laches, statute of limitations and misuse of copyright or unclean hands.

The plaintiff's book, "My Dear Lady," is sub-titled, "The Story of Anna Ella Carroll, A 'Great Unrecognized Member of Lincoln's Cabinet.'" This volume is an historical account of the background, childhood and Civil War activities of one Anna Ella Carroll. Miss Carroll, a member of the famous Carroll family of Maryland, daughter of Thomas King Carroll, a former governor of Maryland, is credited with having devised the plan of the so-called "Tennessee Campaign" during the Civil War.

The book published by the defendants Doubleday and Sears is a fictionalized account of the career of Anna Ella Carroll. Noble, the author, in his acknowl-

edgements, among other things, states: "All of the characters in this book were living persons, with one exception. Harry Heyward is a fictional dramatization of several of Anna Carroll's Southern suitors." It is also stated by Noble that: "All of the major military and political events took place very much in the order in which they are related."

There is no doubt that much of the basic narrative involved in both books is predicated upon certain historical facts or reasonable inferences from those facts.

The plaintiff's book is based largely on documented sources and, reputedly to some extent, on her personal conversations with surviving relatives of Anna Ella Carroll. The book contains an extensive bibliography and an index. Plaintiff, it seems, was inspired to undertake her production when she saw in the Library of Congress a certain card file reference to a two-volume work by Sarah Ellen Blackwell on the life of Anna Ella Carroll. From this card she derived the sub-title of the book. Subsequently, she visited certain surviving relatives of Anna Ella Carroll in Maryland, to wit, one Nellie Calvert Carroll and one Katherine Cradock, nieces of the deceased Anna Ella Carroll. She discovered certain letters and other private papers in their possession, some of which she transferred to the Maryland Historical Society in Baltimore; others she retained in her own custody.

The book, "My Dear Lady," had one printing, of which some 1,400 copies were sold. In 1941 or 1942, the publication was declared out of print by its publishers, McGraw Hill Book Company, Inc.

The book, "Woman With A Sword," published by the defendants, was begun in January, 1945. Noble had been a professional writer and editor in the newspaper, radio and motion picture fields, with previous avocational interests in Civil War matters and in railroads. He had written numerous book reviews for the New York Times, commencing as early as 1931 (Exhibit CC) and had likewise been the author of numerous magazine articles published by the New York Times Magazine Section (Exhibit BB). In January, 1945, Noble's agent, one Barthold Fles, gave Noble a copy of plaintiff's publication, "My Dear Lady," with other books. At the same time it appeared that Noble had previously heard about Anna Ella Carroll, since he showed Fles the reference to her contained in Carl Sandburg's "Life of Lincoln" on page 410 (Minutes, pp. 648–649).

Noble owned a substantial Civil War library and had served as an Army officer and with the Office of War Information during World War II. It appears from the testimony of Mrs. Noble that Noble had many publications relating to this period in his library at Sherman Oaks, California. He also visited the William Wyles Lincoln Library at Santa Barbara College, University of California, the Los Angeles Public Library, the St. Louis Mercantile Library and other libraries. He secured certain information from the so-called "Memorials"—that is, post-Civil War petitions of Anna Ella Carroll to Congress for recognition for her services rendered during the Civil War. He read Blackwell's "Life of Anna Ella Carroll." He visited various Civil War Battlefields and we may conclude that he interviewed certain of the relatives of Anna Ella Carroll.

Noble's agent, Barthold Fles, testified in substance as follows with respect to the procedure of submission of the manuscripts by Noble to Doubleday:

1. On or about April 11, 1946, Fles delivered an outline of 30 to 50 pages and 100 pages of the book to Doubleday (see Minutes, pp. 603–606). (Noble edited the original version. Exhibit BBBB). His preliminary outline and sample writing appears to have been reviewed by Doubleday's Paul Hollister on March 28, 1946 and George Shively on April 11, 1946 (Exhibit DD).)

2. About a month later, apparently in May, 1946, Doubleday and Noble entered into an option agreement and $500 was paid on account (Minutes, p. 609).

3. Between Christmas 1946 and New Years 1947, at Sherman Oaks, California, Fles examined a first draft of 1,400 pages which had been prepared but had not been submitted to Doubleday (Minutes, p. 613).

4. On or about April 10, 1947, a manuscript of some 1,200 pages was submitted to Doubleday (Minutes, p. 611). One-third of that version related to the early life of Anna Ella Carroll; perhaps one-fifth to the Baltimore years; and a little less than half to the war years and after (Minutes, p. 642). This manuscript is no longer available, having been ruined by water at the Noble residence (Minutes, p. 642).

5. A contract (Exhibit 14), was signed between Doubleday and Noble on April 24, 1947 (Minutes, p. 613).

6. On or about May 10, 1947, Fles had conversations with Noble with respect to further revisions (Minutes, p. 614).

7. In September, 1947, a "cut" version was delivered to Doubleday (Minutes, p. 615).

8. On or about November 12, 1947, another version was delivered to Doubleday (Minutes, p. 616).

9. On or about January 1, 1948, a final "cut" and revised version was submitted to Doubleday (Minutes, pp. 615–617).

These facts are substantially undisputed and, accordingly, it is my finding that they are correct.

### Editing

Evidence from the files of Doubleday indicates that the basic manuscript from which "Woman With A Sword" eventually grew was submitted just before April 10, 1947 (see Statement of LeBaron R. Barker, Jr., of Doubleday, Exhibit EE). Mr. Barker, an executive editor with Doubleday, said with respect to this section of the manuscript: " * * * it is a long way from being finished or being a satisfactory manuscript." Barker also said:

"As I understand this project, the author has knocked off three book-length manuscripts of the doings of Ann Carol [sic], daughter of Charles Carol [sic] of Carolton [sic], Maryland. We have an option on this book, having paid $500 with the understanding that we see completed manuscript. It so happens that the first two divisions which are both book length in themselves are too much along the nonfiction line, *but the third book could be made into an historical novel.*" (Emphasis supplied.) (See Exhibit EE.)

Barker read 200 pages of Noble's manuscript in April, 1947 (Minutes, p. 1495). In October, 1947, Noble sent him a manuscript of 750 pages (Minutes, p. 1497). Barker took over active charge of Noble's manuscript for Doubleday when Paul Hollister left in July, 1947 (Minutes, p. 1502). Barker said it was his impression that the manuscript received in April, 1947, was well over 1,000 pages (Minutes, p. 1503). Further change and editing by Noble is set forth in a letter to Barker dated November 17, 1947 (Exhibit JJ). Barker advanced numerous recommendations for insertions and editing, particularly as to conversations between Judge Lemuel D. Evans, Edwin M. Stanton, Edward Bates and Senator Benjamin Wade with Anne —this on February 5, 1948 (Exhibit OO). The revised manuscript submitted by Noble in January, 1948, was obtained from the Unversity of Southern California for this trial and marked in evidence as Exhibit MM. Noble's letter of February 13, 1948, to Barker indicates Noble's continued revision of the manuscript (Exhibit PP). Numerous suggestions of changes in form and verbiage were made by Barker on November 12, 1947 (Exhibit HH). In the meantime, the other manuscripts had been returned to Noble (Minutes, p. 1523). Eileen Lang, the then Mrs. Barker, worked on the manuscript (Minutes, p. 1526). Thirty-nine pages were entirely rewritten; 543 pages were changed in part; 60 or 70 pages

were cut out (Minutes, p. 1528). Noble made certain changes in the galley sheets, including the reduction of Evans' and Miss Carroll's ages by ten years each (Minutes, p. 1532). Barker concedes that he "skimmed" through plaintiff's book in October 1947 (Minutes, pp. 1593, 1692). He likewise "skimmed" through Blackwell (Minutes, p. 1594). When Barker read "Woman With A Sword" he said that he was convinced it was an independent work (Minutes, p. 1663). He says he never used the Greenbie book to check research in the Noble book (Minutes, p. 1697).

Differences in the Two Books

"Woman With A Sword" was summarized by "Life" magazine in 1948 as follows:

" * * * This month, with *Woman with a Sword* by Hollister Noble, Doubleday & Company, Inc. is publishing the 49th Civil War novel since *G. W. T. W.* [*Gone with the Wind*]. Based largely on historical documents, it traces the career of the woman who conceived what Major General Cassius Clay declared to be 'the great strategical coup of the war.' Anna Ella Carroll came from a family which included Charles Carroll, a signer of the Declaration of Independence, and John Carroll, the first U. S. Catholic bishop, who founded Georgetown College. Her father was elected governor of Maryland. Anna Carroll herself started on her career early, as a lawyer, writer and amateur politician. By 1861 her activities had so impressed Lincoln that she became virtually an unofficial member of his Cabinet. Uncertain about proposed Union strategy, Lincoln and his Assistant Secretary of War, Colonel Thomas A. Scott, asked Miss Carroll to go to St. Louis and evaluate the Union plan to gain control of the Mississippi River in order to cut off Confederate supply lines from the west. Her studies convinced her that the Tennessee River, not the Mississippi, held the key to the war.

She made her report to Scott and Lincoln, and they agreed. At that time, however, the President could not risk ordering his army to carry out the plan if they knew it was conceived by a civilian, least of all a woman. Without revealing its source Lincoln persuaded his generals to use the Tennessee Plan. Miss Carroll's strategy did not cover the entire conduct of the war, but her idea of switching the attack to the Tennessee River started the Union on the marches that led to Vicksburg, Atlanta and, finally, Appomattox.

"When Lincoln dispatched Anna Ella Carroll to St. Louis to size up the possibilities of invading the South via the Mississippi River, she was accompanied by Judge Lemuel Evans, a secret agent on the Union side. In the five weeks Miss Carroll and Judge Evans spent in St. Louis they formed a notable attachment. Charles Scott, the riverboat pilot who helped Anna devise her plan, even mentioned it in Congressional hearings. 'I rarely saw them apart,' he said. 'The judge was very devoted to her.' The friendship lasted until Evans' death in 1877. They never married. Miss Carroll's elderly niece thinks 'Judge Evans was not a marrying man.' As for Miss Carroll, she was more interested in a career than in marriage, although society notes of the time describe her as a reigning belle who included among her suitors President James Buchanan. Evans went back to Texas and became chief justice of the state Supreme Court. Anna stayed in the North, fighting to gain equal rights for Negroes and trying to get some recognition and payment for her wartime services. Although Union officials praised her for her role in winning the war, Anna Ella Carroll never received public recognition. She died at 78, worn out, an invalid in the home of her spinster sister in Washington, D. C. and a

*cause celebre* of the women's suffrage movement." (Exhibit OOOO.)

Long before any claim of infringement was made by plaintiff, Barker of Doubleday described the theme of "Woman With A Sword" as follows:

"To my way of thinking, it is primarily the account of how Anne Carroll saved the Union, in particular through her Tennessee Plan. Secondly it is the love story of Anne and Lem Evans, with Harry Ravenel [later named Harry Heyward in the final version] as the third and losing side of the triangle. Finally it is the story of Anne herself as she was changed and matured by important historical events and by her association with such people as Lincoln, Stanton, Wade, etc. The story line to my way of thinking is Anne's all the way, but in the background is the story of the Civil War, Washington during the war, and the great problems of the Times." (Exhibit HH.)

Plaintiff's book, "My Dear Lady," as described in the index card of the Library of Congress, is the story of Anna Ella Carroll, the "great unrecognized member of Lincoln's cabinet," and is classified as *biography and history* (see Exhibit JJJJ–2). Noble's book, "Woman With A Sword," is described as "the biographical novel of Anna Ella Carroll of Maryland" and listed as *fiction* (see Exhibit JJJJ–1).

Some 191 characters, either historical or fictional, *not* mentioned in plaintiff's book, appear in Noble's book (see Exhibit QQ). The names of many of these historical characters mentioned in his book and the historical connection of each with the Civil War (see Exhibit W) are convincing testimony of Noble's independent research. Anne, in Noble's book, is 35, although she was actually 45 in 1861 (Minutes, p. 284); Evans was actually 51 at that time (Minutes, p. 285).

Differences between Mrs. Greenbie and Noble in the treatment of Anne Carroll's activities in the Civil War were set forth at length by Barker (see Minutes, pp. 1536–1574, 1604–1655, 1673–1684). The differences included not only the mode of treatment, but essential differences in content. Many items not included in Greenbie appear in Noble.

Barker gave the following reasons why Noble's book sold so many more copies than Mrs. Greenbie's book (see Minutes, pp. 1668–1671, 1688–1690, 1709):

1. The public wants a stronger storyline while it will not go for a straight narrative of historical facts (Minutes, p. 1668);

2. The Noble book is readable; the Greenbie book is much harder to read (Minutes, p. 1669);

3. The Greenbie book is not a popular kind of book, while the Noble book is (Minutes, p. 1669);

4. Differences in promotion, including the brochure sent out by Doubleday (Minutes, pp. 1669, 1688).

Barker summed up his opinion as follows:

"Based on my knowledge of the book trade and publishing, the Greenbie book I do not think was in a form or in a style which could possibly get the large audience that the Noble book did, which very definitely was in a form and style which could. I think that is the basic reason." (Minutes, p. 1709.)

The total royalty received by Mrs. Greenbie for "My Dear Lady" was about $412.50 (Minutes, p. 1836). She also received $1,600 for the use of her Carroll material from the Women's Home Companion (Minutes, p. 1839). Mrs. Greenbie sold 2,000 copies of her second book, "Anna Ella Carroll and Abraham Lincoln," published in 1952 (Minutes, p. 1837).

Sears actively promoted the sale of "Woman With A Sword" to its book club members with attractive and colorful brochures and novelized illustrations (Exhibit Y). Doubleday also had published full page advertisements in the New York Herald Tribune Book Section, emphasizing the fictional features of

"Woman With A Sword" before Noble's book came on for retail sale (Exhibit D).

From the foregoing, it is my opinion that the two books were basically different in purpose, treatment, promotion and character.

Investigations and Research by Noble

Mrs. Noble said that when Fles gave Noble a number of books in January, 1945, at Sherman Oaks, California, Noble picked up "My Dear Lady" and said: " ' * * * this is the Carroll story,' and then he started to talk about the story." (Minutes, p. 692.) When Fles came back to Noble that day, Noble in talking about the Carroll story said: " * * * it should be a novel." (Minutes, p. 695.)

Noble thereafter visited the Los Angeles Public Library, the William Wyles Lincoln Library at Santa Barbara, the Huntington Hartford Library at Pasadena and other libraries (Minutes, p. 694). Noble had many volumes in his home, including two volumes of Blackwell, "Life of Anna Ella Carroll" (Minutes, p. 696), a most important work containing the basic Carroll material, including Miss Carroll's own publications, Congressional reports, letters and much personal data. Mrs. Noble testified that each day her husband would start typing between 7:30 and 8:00 A.M. and type either the manuscript or notes until about 2 or 3 in the afternoon; then he would work with the books, making notes. With the exception of the trip Noble took (April 19, 1947 to June 9, 1947) and a couple of short vacations, this went on for three years (Minutes, p. 696).

Mrs. Noble produced a series of notes made by her husband while writing "Woman With A Sword." Some were typewritten and some in his handwriting. On the typewritten notes, he had placed certain index tabs. She said none of these notes were prepared after December 1, 1948. He used these notes in preparing his manuscripts and she saw him reading the two volumes of Blackwell. (This is confirmed by the notes.) Some of these notes were made in Mrs. Noble's presence at Sherman Oaks; some at the William Wyles Lincoln Library in her presence; other notes were destroyed by water in the basement of their home in 1950 or 1951. Noble wrote on no other subject between 1945 and 1948 (Minutes, pp. 697–715).

Mrs. Noble identified a so-called "Partial Bibliography" prepared by her husband (see Exhibit T–2), and listed a number of publications appearing thereon which he had at his home (Minutes, pp. 721–724).[1] She also said that he owned certain books listed in the bibliography (Minutes, pp. 738–740).[2] It ap-

1. These included Blackwell's two volumes; Century Magazine; Revised History of Dorchester County, by Elias Jones; Abraham Lincoln: The Prairie Years: The War Years, by Carl Sandburg; The Novel and the People, by Ralph Fox; Memories of the White House, by Col. W. H. Crook; Edwin McMasters Stanton. The Autocrat of Rebellion, by Frank Abial Flower; Life and Public Services of Edwin M. Stanton, by George C. Gorham; The Civil War in the United States, by Karl Marx and Frederick Engels; Recollections of War Times, by Albert Gallatin Riddle; Lost Men of American History, by Steward H. Holbrook; Memoirs of a Volunteer, by John Beatty; McClellan's Own Story, by George B. McClellan; The Sherman Letters, edited by Rachel Sherman Thorndike; The Story of Shiloh, by Otto Eisenschiml; A Belle of the Fifties, Memoirs of Mrs. Clement Claiborne Clay; Life on the Mississippi, by Mark Twain; The Crisis, by Winston Churchill; The Mind of the South; Harriett Tubman, by Earl Conrad; Life of Charles Carroll of Carrollton, by Kate M. Rowland; The Story of the Baltimore & Ohio Railroad, by Edward W. Hungerford; Lincoln in the Telegraph Office, by David Homer Bates; Lincoln and the Railroads, by John W. Starr, Jr.; Governor Thomas H. Hicks of Maryland and the Civil War, by George L. P. Radcliffe; The Impending Crisis of the South: And How to Meet It, by Hinton Rowan Helper; History of the Know Nothing (American) Party in Maryland, by Lawrence Frederick Schmeckebier; America Through Women's Eyes, by Mary Beard.

2. Abraham Lincoln: The Prairie Years; The Death of Lincoln, by Clara E. Laughlin; Edwin McMasters Stanton.

peared that in June, 1947, Noble secured from Washington photostatic copies of letters from Anne Carroll to Lincoln and letters from Senator Browning to Miss Carroll (Minutes, p. 705; Exhibits L–1, L–2, L–3, L–4). Mrs. Noble said she never saw her husband open "My Dear Lady" and look at it while he typed (Minutes, p. 756).

Everette Beach Long, a Civil War Research scholar, examined certain of the aforementioned notes (identified by Mrs. Noble), collected by Noble in the course of his writing "Woman With A Sword." In Long's testimony he noted the use of much of this material in Noble's book; he stated the probable source of the notes. From this testimony it is evident that Noble consulted and made excerpts from certain works.[3]

Certain sheets of Exhibit T (pp. 103A, 103B, 103C) are headed "Balt." and are

The Autocrat of Rebellion; The Civil War in the United States; Lost Men of American History; Memoirs of a Volunteer; The Story of Shiloh; Reveille in Washington, by Margaret Leech; The Crisis; Life on the Mississippi; The Impending Crisis of the South: And How to Meet It; America Through Women's Eyes.

3. Grant's Memoirs, Minutes, pp. 809, 1011; House Miscellaneous Document 179, 44th Congress, First Session, Serial 1706, pp. 813, 1004, 1022; House Miscellaneous Document 58, 45th Congress, Second Session, Serial 1820, pp. 814, 983, 1022; Senate Report No. 339, 41st Congress, Third Session, p. 814; Senate Report No. 775, February 18, 1879, 45th Congress, Third Session, p. 1161; Charles M. Scott letters in the Carroll memorials, p. 817; The Civil War Career of Thomas A. Scott by Samuel R. Kamm, p. 952; Sarah Ellen Blackwell, The Life of Anna Ella Carroll, vol. I, p. 818; Sarah Ellen Blackwell, The Life of Anna Ella Carroll, vol. II, pp. 961, 1079–1084; Sarah Ellen Blackwell, The Life of Anna Ella Carroll, vol. II, Reply to Breckenridge, p. 861; Sherman by Liddell Hart, p. 822; Harper's Weekly, p. 827; Harper's Weekly, January 4, 1862, p. 972; Leslie's Weekly, pp. 826–827; The Tennessee, the Old River, Frontier to Succession, Rivers of America, by Donald Davison, pp. 840–845; Congressional Globe, 37th Congress, Second Session, Part I, pp. 930 to 943, S.M. 853; Congressional Globe, 37th Congress, February 24, 1862, p. 930, S.M. 919–920; Congressional Globe, 37th Congress, Second Session, Part 2, p. 1206, S.M. 968; Congressional Globe, 37th Congress, Second Session, Vol. 1, p. 438, S.M. 1075; Abraham Lincoln: The War Years, vol. I, by Carl Sandburg, pp. 854–859; Abraham Lincoln: The War Years, vol. II, by Carl Sandburg, p. 62, S.M. 1057; Abraham Lincoln: The War Years, vol. IV, p. 259, S.M. 1062; Histories of Baltimore, p. 868; Lincoln Anecdotes; Lincoln's Own Stories, by Anthony Gross, p. 869; Lincoln in the Telegraph Office, by David Homer Bates, p. 870; Abraham Lincoln and Men of War-Times, by A. K. McClure, pp. 874–877; Chesapeake Bay Country, by Sefton Earle, p. 889; The Virginian, by Owen Wister, p. 895; Reveille in Washington, by Margaret Leech, p. 895; Fernando Wood letters in Maryland Historical Society, p. 903; Letters in Maryland Historical Society, p. 1009; Maryland Historical Society, pp. 1095, 1101; Secret History of the Southern Confederacy, by Edward A. Pollard, pp. 905–915; Star of the West, by Anna Ella Carroll, p. 916; North America Review, April 1886, article by Anna Ella Carroll, pp. 923, 949; The Mind of the South by W. J. Cash, pp. 920–922; Revised History of Dorchester County, by Elias Jones, p. 927; Governors of Maryland, by H. E. Bucholtz, p. 930; Special Md. Legislature Brooks, pp. 933–934; Biography of Breckenridge, p. 936; Lincoln's War Cabinet, by Hendricks, p. 937; Recollections of War Time, by A. G. Riddle, p. 939; John M. Schofield's 46 Years in the Army, p. 946; Fremont, by Allan Nevins, p. 948; Century Magazine, February 1886, p. 950; Official Records of the War of the Rebellion, Series 3, vol. 1, serial 122, p. 958; New York Herald, April 15, 1865, p. 988; copy of letter from Lincoln to Seward (from Seward Collection), p. 995; The Story of Shiloh, by Otto Eisenschiml, p. 1013; Battles and Leaders of the Civil War, vol. 1, pp. 465–486, S.M. 1013; Draper's History of the Civil War, vol. 1, pp. 1016–1020; A Man Named Grant, by Helen Todd, p. 1052; DeTocqueville's Democracy in America, pp. 1052–1053; Memories of the Men Who Saved the Union, by Donn Piatt, p. 1054; Dana Dispatches in the War Department, pp. 1069–1071; Scott's Reports & Records in the War Department, p. 1133; Life of B. F. Wade, by A. G. Riddle, p. 1139; Edwin McMasters Stanton by Frank A. Flower, p. 1146.

dated May 26, May 27 and May 28 respectively. One has "47" on it (Minutes, pp. 1121–1122). Certain notes contained in Exhibit T, according to the opinion of Mr. Long, appear to be from letters which, according to the plaintiff, as shown in her book, "Anna Ella Carroll and Abraham Lincoln," came from papers in the Maryland Historical Society (Minutes, p. 1108). There is, therefore, some evidence that Noble visited the Maryland Historical Society and made excerpts from the letters available there.

Noble's extensive notes are catalogued under different headings and indicate wide research into many details (Exhibit T). These papers also include notes of Old Trinity Churchyard gravestones of the Carroll family (Exhibit T, p. 44). Noble obtained a copy of a portrait of Evans and secured a brochure of the sale of Kingston Hall (Exhibit T). Notes on stationery of Marshall Library, Marshall, Texas, about the Evans family, indicate Noble's visit to Texas (Exhibit T, p. 62). In a paper, which appears came from the Seward Collection at Auburn, New York, Evans is listed as a Secret Service Agent of the State Department (Exhibit T, p. 1). Noble's handwritten notes, dated Balt. May 26/47 (Exhibit T–103), indicate excerpts from various Carroll papers. Many of these appear to have been in the Maryland Historical Society at the time, and there only. Thus it is evident that Noble must have had personal access to these records. Mrs. Greenbie at one time stated that Noble had consulted the Carroll papers, presumably in the Maryland Historical Society (Minutes, p. 1910). She admits depositing in the Maryland Historical Society copies of the Congressional Globe of 1861 and 1862 with markings in the handwriting of Anna Ella Carroll (Minutes, p. 541). Mrs. Greenbie concede that the Congressional Globe was put in the Maryland Historical Society on December 11, 1940 (E/B/T, p. 494).

On April 19, 1947, Noble left home on a trip, prior to which he expressed an intention to visit the Carroll relatives in Maryland, the Evans relatives in Texas, the Mercantile Library in St. Louis, Washington, D. C. and Auburn, New York, the home of the Seward Collection (Minutes, pp. 651, 652, 718–733; Letter, Exhibit 16). He returned on June 9, 1947.

On April 14, 1947, in a card to Fles, postmarked Shreveport, Louisiana, Noble indicated his intention to visit the Vicksburg battlefield (see Exhibit RRR). In a letter to Fles, Noble stated his intention of making "brief stops for quick check ups at Marshall, Texas; Vicksburg, Shiloh, Paducah, the Eastern Shore, and New York (Exhibits ZZZ and AAAA). On April 29, 1947, Noble claimed to have traveled 4,359 miles since April 19, 1947 (see Exhibit UUU).

There is some evidence that Noble visited and examined the Seward Collection at Auburn, New York, and found material there in respect to Evans and others (see Exhibit T(1); see also Exhibit VVV, where Noble wrote to Fles that "We finally got the Sewards to open up their private collection here. You should see it! Bales of Lincoln letters lying around loose. Not even Government men have seen this stuff. And here are records of old 'Evans'—'L. D. Evans—Secret Service, Confidential missions for the President—per William H. Seward'").

Noble appears to have examined Stanton's private papers at Washington in May, 1947 (Exhibit QQQ) and to have had a visit with Nellie Calvert Carroll, niece of Anna Ella Carroll, in Maryland in April, 1947 (see Exhibit UUU). The Stanton papers seem to have provided "convincing proof of Miss Carroll's work" (see Exhibit XXX). It also appears that Noble did a week's research reading the Congressional Record (then the Congressional Globe) (see Exhibit YYY). He also said he read the Memoirs of a Volunteer (Exhibit YYY).

On February 13, 1948, Noble wrote to Barker of Doubleday, in part, as follows:

> "I am sending you in a few days some letters of Anne's found in the recently opened Lincoln papers. They aren't important to the story,

but I thought you and your wife might find them of interest in regard to Anne's thinking and character generally. I think her handwriting very revealing—breezy, strong, confident, yet graceful and feminine.

"They also testify to her frequent interviews with Lincoln. If you ever have five minutes in the library you would enjoy reading Anne's own account of 'The Tennessee Plan' in the 'North American Review' for April, 1886. The gal could write even as an elderly woman." (See Exhibit PP.)

A Reader's Record Card of the Library of Congress, Division of Manuscripts, in Noble's writing, shows that he visited it on May 29, 1947, and that he appears to have examined certain Stanton and Chase papers (see Exhibit U).

Norman B. Nash, a witness for the defendants, who was formerly a Bishop of the Episcopal Church and a resident of Cambridge, Massachusetts, testified that he had known Noble for many years and that Noble was Mrs. Nash's only and younger brother. He said that he arrived in Washington, D. C. late the evening of Friday, May 30th, en route to his daughter's graduation on June 1 and 2nd at the Madeira School, located just outside of Washington. He was in Washington all day on Saturday, May 31st and he met Noble coming out of the Library of Congress (Minutes, pp. 1269–1274).

Noble, in his letter of September 16, 1947, to Barker of Doubleday, mentions searching the Congressional investigations, the Library of Congress, the War Department, the Lincoln papers, then recently opened in the Library of Congress, the Seward Collection at Auburn, New York, the Stanton papers, the National Archives, the Maryland Historical Society, personal interviews with two of Anne Carroll's nieces, that is, Nellie C. Carroll and Katherine Cradock, personal correspondence with a Mrs. Ely Blount of Texas, a collateral descendant of Evans, a detailed tour by motor of the battlefields of the war (Exhibit FF).

Nellie C. Carroll, on October 25, 1947, wrote to Mrs. Greenbie that Noble had visited her in April, 1947, and had stated that he expected to come back in September and spend several days in Dorchester checking up on some details and that he also went to see Miss Cradock (see Exhibit F).

Certain manuscripts of Anna Ella Carroll were deposited in the Maryland Historical Society in September, 1942, by Katherine Cradock, niece of Anna Ella Carroll (see Exhibit GGG). These papers included letters from Fernando Wood, Mayor of New York City, to Miss Carroll under the following dates: January 30, 1860 (Exhibit AAA), February 10, 1860 (Exhibit CCC), March 7, 1860 (Exhibit ZZ), March 20, 1860 (Exhibit DDD), May 9, 1860 (Exhibit BBB), undated (Exhibit EEE); also two letters from Charles M. Scott, the pilot, to his wife, Anna, dated February 14, 1862 (Exhibit XX) and February 17, 1862 (Exhibit YY) and a letter from Charles M. Scott to Miss Carroll, dated May 2, 1862 (Exhibit FFF).

On February 21, 1947, Noble wrote to Barthold Fles, in part, as follows:

"3) On the other hand, tho' I'm an easy-going guy, I won't let this book come out without taking certain precautions. Do you realize I've written the whole damn thing without a single glance at any of the original source material?" (See Exhibit 16.)

In the same letter (Exhibit 16) Noble also states: " * * * I think Mrs. Greenbie and Sarah Blackwell probably did a pretty good job." Later, on December 27, 1947, in a letter from Noble to Fles (Exhibit 17), he asked Lee (apparently referring to Barker of Doubleday) "to send out 'My Dear Lady' at once. I need to check some details badly."

Fles testified in effect that at least once or twice the book, eventually entitled, "Woman With A Sword," was known as "My Dear Lady project" (Minutes, pp. 634–636); and other times the

book was entitled, "Silence So Deafening" and "Forgotten Glory" (Minutes, pp. 638–639).

In the letter of February 21, 1947, Noble indicated his intention of visiting the Eastern Shore, to gossip with "Annie's" relatives or descendants, to check the locale and general legend of "Annie" on the Eastern Shore, to check Congressional reports, War Department material and look up Evans' record at the War Department (see Exhibit 16).

Fles stated that he saw copies of Blackwell's "Life of Anna Ella Carroll" in the possession of Noble at Noble's home before the delivery of the outline and the 100 sample pages, which was on April 11, 1946 (Minutes, pp. 649–650).

Plaintiff may urge that Noble's statements in Exhibits 16 and 17 are confessions of copying. This is not my opinion. What Noble had prepared by February 21, 1947, could easily have been, and I believe was, written by him from Blackwell and from the other materials at hand. Blackwell and the "Memorials" from Congressional records provide quite a complete story about the life of Anna Ella Carroll. The other words known also to be available were adequate for background and general history. All of the facts, including Noble's activity, the books open to him, the notes he made, indicate this. The investigations subsequently made by him in the spring and early summer of 1947 supplemented what

he already had done. All were ultimately utilized in whole or in part.

Mrs. Greenbie admits that her book was intended as a biography of Anna Ella Carroll (Minutes, p. 179) and that it is composed of facts about the life of the subject (Minutes, p. 183). She also stated on cross-examination that when she wrote "My Dear Lady" it was her intention that the public should rely upon it as a truthful statement of the events (Minutes, p. 330). Thus, Mrs. Greenbie's book purported to be historically sound. She clearly so intended, as her testimony reveals. Noble had a right to use it as a guide, supposedly true in its basic veracity. He checked the fundamental records himself by going to the sources. To believe that the notes Noble made (Exhibit T) were constructed *after* being faced with a claim by Mrs. Greenbie is without foundation.

■ It is my opinion that the evidence in this case establishes that Noble independently researched the facts concerning the life of Anna Ella Carroll.

### Profits

No proof of damages for publishing, vending or printing was offered by the plaintiff, However, the profits earned by the defendants, without regard to questions of apportionment thereof or liability, are as follows:

The profits of Doubleday from the sale of "Woman With A Sword" are:

```
Net book sales ............................$56,516.29
Total book expenses ......................  53,801.58
                                             ─────────
      Net Profit Book Sales .............................$  2,714.71
Subsidiary rights (including sale under
license to Sears (People's Book Club, Inc.):
Gross Income ...................$35,425.00
   Author's Share ....$17,712.50
   Expenses ..........  4,456.18
                        ─────────
      Total Deductions ............$22,168.68
                                    ─────────
      Net Profit Subsidiary Sales .......................$13,256.32
                                                         ──────────
             Total Net Profit ...............$15,971.03
```

The receipts of Sears, Roebuck & Company from "Woman With A Sword" were $227,889 (see Exhibit 22).

The expenses of People's Book Club, Inc. from August 20, 1948 to October 5, 1948 (when the book, "Woman With A

Sword" was featured) totaled $187,850. During this period, less than 5% of the total business was from the sale of other books (Minutes, p. 1302).

Sears charged 100% of the expenses for this period against "Woman With A Sword" upon the ground that no other book was used as a first selection to the Club members (Minutes, pp. 1322–1325; see also 1353).

Cobb, for Sears, conceded that actually "Woman With A Sword" did not represent 100% of the sales during that period (Minutes, p. 1322). He said that during this period at least 95% of the books shipped were "Woman With A Sword" (Minutes, p. 1331). This was the customary experience for 1948, 1949 and 1950 in respect to a particular book selection (Minutes, p. 1331).

The expenses during the March 1949 period (when the People's Book Club, Inc. promoted the special sale of "Woman With A Sword") were apportioned to the extent of 12½% against this book (Minutes, p. 1305; see also 1344). This was based upon proportionate number of copies of "Woman With A Sword" that were shipped that month to the *total number* of books sold during that period (Minutes, p. 1306). Twelve and one-half per cent of these expenses amounted to $24,204 (see Schedule D of Exhibit Z).

The expenses for sales after March 31, 1949, charged were $12,003 (see Exhibit Z; Minutes, p. 1308). This was determined as follows: (1) Sears took the total number of copies of "Woman With A Sword" sold August 20, 1948 to October 5, 1948 and in March 1949, and found that it represented 94% of all copies distributed; (2) then Sears took 6% of the expenses of these two periods and used it as the expense of the other 6% of the books distributed (Minutes, pp. 1308–1309; see also 1350).

The application of 6% of the expense of the two periods for sales after March 31, 1949, is not strictly correct. The percentage should be based on what percentage 6 is of 94% or 6.38% of the expense for the periods.

Accordingly, in my opinion, the profits of Sears are as follows:

Receipts from books ...............................$227,889.00
   (1) Expenses from August 20, 1948 to
       October 5, 1948: 95% of
       $187,850 ..........................$178,457.50
   (2) Expenses for March 1949 ............  24,204.00
   (3) Expenses for all other months:
       6.38% of the total of (1) and
       (2)—$202,661.50 ...................  12,929.80..$215,591.30

                 Net Profit ............$ 12,297.70

### Affirmative Defenses

Defendants, as stated, have asserted certain affirmative defenses. Before consideration of the merits, I will first determine the validity of such defenses:

#### (1) That Plaintiff Is Not the Proper Party to Sue

The defendants contend that plaintiff is not the proper party to sue for the alleged infringement of the copyright. This argument stems from the fact that plaintiff assigned her publication rights to her publisher, McGraw-Hill Book Company, Inc., in a writing signed by plaintiff on June 3, 1948, which reads in part as follows:

" * * * The Author agrees to prepare and to supply to the Publishers the manuscript, illustrations and index for a work entitled

"My Dear Lady: The Story of Anna Ella Carroll

or such other title as may be agreed upon by the parties hereto, and agrees to and does hereby sell and assign the said work and the sole

right to publish the same in book form to said Publishers, including all revisions and future editions thereof, and the rights of translation into all foreign languages.

\* \* \* \* \* \*

"1. Copyright. The copyright shall be taken out in the name of the Author, and shall be her sole property." (Exhibit A.)

However, the above assignment does not purport to convey all of the rights secured by the copyright. Plaintiff retained her right to make another version thereof by novelizing her work. In Fitch v. Young, D.C.S.D.N.Y., 1916, 230 F. 743, affirmed 2 Cir., 239 F. 1021, which is cited by defendants in support of their contention, Judge Learned Hand held that a publisher who reserved the right to multiply copies of a play would be required to sue for its infringement by a novel which copied the play. The copyright for the play was obtained before the right to novelize came into existence under the Copyright Act of 1909, and consequently the only basis for the action was "by virtue of the exclusive right to 'copy' granted by section 4952 of the Revised Statutes \* \* \*." 230 F. at page 745. Having failed to retain the specific right to copy the play, the author was not the proper party to sue for the infringement of that right.

■ In the instant case, plaintiff has retained her right under 17 U.S.C.A. § 1 (b) to make another version by converting her biographical work into a novel and is the holder of the legal title to the copyright. As holder of the legal title, she is properly entitled to maintain this action. See Widenski v. Shapiro, Bernstein & Co. Inc., 1 Cir., 1945, 147 F.2d 909; Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 2 Cir., 1944, 140 F.2d 268; M. Witmark & Sons v. Pastime Amusement Co., D.C., 298 F. 470, affirmed 4 Cir., 1924, 2 F.2d 1020.

## (2) Laches

■ Defendants claim that plaintiff is guilty of laches in that she commenced this action approximately six years after she acquired knowledge of the alleged infringement. When a copyright holder has acquiesced in, or failed to object to, the acts constituting the alleged infringement so as to induce the infringer to incur financial obligations, such delay in bringing suit will give rise to an equitable defense to the action. Universal Pictures Co., Inc., v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354; D. O. Haynes & Co. v. Druggists' Circular, 2 Cir., 1929, 32 F.2d 215; Edwin L. Wiegand Co. v. Harold E. Trent Co., 3 Cir., 1941, 122 F.2d 920, certiorari denied 316 U.S. 667, 62 S.Ct. 1033, 86 L.Ed. 1743; Gilmore v. Anderson, C.C. S.D.N.Y., 1889, 38 F. 846. In the case at bar, plaintiff did not acquiesce in the publication of "Woman With A Sword." Indeed, in a letter dated November 30, 1948 (Exhibit 5), her attorney notified the defendant Doubleday of her copyright claim and objected to the publication of the said book. Plaintiff's conduct was not sufficient to justify a belief on the part of Doubleday that there was an assurance of immunity from a claim of liability. See Universal Pictures Co., Inc. v. Harold Lloyd Corp., supra; Szekely v. Eagle Lion Films, Inc., 2 Cir., 242 F.2d 266; Loew's Incorporated v. Columbia Broadcasting System, Inc., D.C. S.D.Cal., 1955, 131 F.Supp. 165. In any event, this Court will be guided by the applicable statute of limitations in determining whether this suit should be dismissed because of laches.

"\* \* \* While it is true that federal courts sitting in equity are not bound by state statutes of limitations (Kirby v. Lake Shore & Michigan Southern Railroad, 120 U. S. 130, 7 S.Ct. 430, 30 L.Ed. 569), they are, under ordinary circumstances, guided by them in determining their action on stale claims." Benedict v. City of New York, 250 U.S. 321, 327, 39 S.Ct. 476, 478, 63 L.Ed. 1005. See also D. O. Haynes & Co. v. Druggists' Circular, supra; Pathe Exchange, Inc. v. Dalke, 4 Cir., 1931, 49 F.2d 161.

### (3) Misuse of Copyright or Unclean Hands

One of the defenses alleged is misuse of copyright or unclean hands. This defense apparently is based upon the following contentions: (A) Control by the plaintiff restricting the material deposited by her in the Maryland Historical Society; (B) Plaintiff's blocking out the so-called Anna Ella Carroll story to preempt motion picture and fictional rights.

The evidence supporting these claims is in substance as follows:

### (A) Restrictions

Mrs. Greenbie sought to keep the materials collected by her out of the public domain by depositing certain documents in the Maryland Historical Society (Minutes, p. 1907). She conceded that she imposed an injunction on the records deposited in the Maryland Historical Society (Minutes, p. 191) because of Miss Nellie Carroll's reluctance to give them to the Society (Minutes, p. 193).

### (B) Control of the Anne Carroll Story

As early as October 25, 1947, Mrs. Greenbie learned from Nellie Calvert Carroll that Noble was writing a fictional story of Anna Ella Carroll, Miss Nellie's aunt; that Noble had signed a contract with Doubleday, and that both Nellie Calvert Carroll and Katherine Cradock were of the impression that "they [apparently referring to Noble] would work up a motion picture." (See Exhibit F.)

On July 29, 1948, Maxwell Aley, plaintiff's agent, revealed Mrs. Greenbie's concern with "Hollywood" in his telegram to plaintiff (see Exhibit C). Aley, on behalf of the plaintiff, apparently sought to lay claim to all material with respect to Anna Ella Carroll when he wrote to the Crosby Enterprises on July 29, 1948, stating: "Control all rights to Anne Carroll material." (See Exhibit H.)

On January 17, 1949, Aley wrote to Mrs. Greenbie urging legal action against Noble. He said: "The moment that legal steps are taken your position becomes entirely different, and I think any attempt at a picture based on Noble's book will be stopped. This kind of thing scares the pants off Hollywood." (See Exhibit E.) Mrs. Greenbie's intention to control the Anna Ella Carroll story was evidenced in her letter to a woman who wanted to write an article on Anna Ella Carroll, when Mrs. Greenbie said: " * * * she must understand that any Anna Ella Carroll material—that the Anna Ella Carroll material had already been copyrighted in 'My Dear Lady,' and that I would consider that anything written based on—anything written of that story which also existed in 'My Dear Lady' was copyrighted material." (E/B/T pp. 346–347.)

Mrs. Greenbie's intentions in respect to "My Dear Lady" were set forth as follows in her Examination Before Trial:

" * * * we decided that we would make two jobs out of it, and for the sake of settling it, especially since we had the Woman's Home Companion proposition, we would simply get on with all the documentary material, and fix the copyright, and then we would work more leisurely and write the more complete and fictionalized story." (P. 330.)

" * * * It was part of our plan that we would fix the copyright definitely by getting out a preliminary book as fast as possible, and then I would rewrite that book. It didn't matter to me as long as we sold enough copies and fixed it. I didn't care what the sale was in our general overall plan." (P. 521.)

In the course of the examination, she admitted that her book, "My Dear Lady," was superficial in its coverage of the factual background. She said she didn't build up the detail because:

" * * * the publishers didn't favor it at the moment and because it was always the idea in my mind that it was the first draft.

"I thought I would do the story and have it copyrighted, especially since so many motion picture people were interested in it at the moment. I thought I would get it set and do it over. * * *" (P. 233.)

"I had several motion picture negotiations pending already, and I was trying to get the stuff in order to hold the thing for the motion pictures." (P. 445.)

The prohibition against improper use of a copyright was stated in Columbia Pictures Corp. v. Coomer, D.C.E.D.Ky., 1951, 99 F.Supp. 481, as follows:

" * * * a copyright holder, like patentees and other holders of an exclusive privilege granted in furtherance of a public policy, may not claim the court's protection where he is using his grant to subvert the very policy upon which it rests. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 494, 62 S.Ct. 402, 86 L.Ed. 363. Thus, where a copyright holder seeks to impose price control upon future sales of an article, after having sold or otherwise divested himself of title to it, so that the article, as such, passed out of the domain of the copyright, as was found in Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086, and Straus v. American Publishers' Ass'n, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, or when such price fixing licenses are found to be a means of extending the copyright monopoly so as to govern the admission price to exhibitions or entertainments which include pictures or features not covered by the copyright, as was found in Interstate Circuit v. United States, 306 U.S. 208, 228, 59 S.Ct. 467, 83 L.Ed. 610, or where price maintenance is shown to constitute a part of a general plan, combination or conspiracy to unreasonably restrain interstate trade and commerce in motion picture films or to monopolize or suppress competition in the exhibition thereof as found in United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160, such price-fixing agreements violate the Sherman Act and are afforded no immunity by the copyright laws. United States v. Paramount Pictures, 334 U.S. 131, 144, 68 S.Ct. 915, 92 L.Ed. 1260." (Pp. 482–483.)

■ By depositing the Carroll letters with the Maryland Historical Society subject to the consent requirement, plaintiff did not thereby obtain a monopoly on the story of the life of Anna Ella Carroll. Nor did she effect such deposit by reason of her control of the copyright for "My Dear Lady." Consequently, it cannot be said that plaintiff used her copyright as a means of extending it beyond its proper scope or that she did in fact enlarge the copyright monopoly so as to embrace features not covered by the copyright.

■ Mrs. Greenbie's efforts to obtain a copyright for her book so that she could thereafter "hold the thing for the motion pictures" cannot be interpreted as a monopolization by her of the Anna Ella Carroll story, even though Mrs. Greenbie may have acted in this belief. It merely illustrates her unfamiliarity with the scope of her copyright.

The alleged misuse is no defense to this action.

(4) Statute of Limitations

Defendants have also interposed in their answer an affirmative defense of statute of limitations. The Copyright Act, 17 U.S.C.A. § 1 et seq., prescribes no time limitations with respect to the commencement of an action for infringement. Consequently, in the absence of a federal statute of limitations, an action for a copyright infringement "would be limited by the limitation existing for the class of actions to which it belongs, *in the state where the action was brought.*" (Emphasis added.) Brady v. Daly, 175 U.S. 148, 158, 20 S.Ct. 62, 66, 44 L.Ed. 109. See also Local Trademarks, Inc. v. Price, 5 Cir., 1948, 170 F.2d 715; D. O. Haynes & Co. v. Druggists' Circular, 2 Cir., 1929, 32 F.2d 215; Carew v. Melrose Music, Inc., D.C.S.D.N.Y., 1950, 92 F.Supp. 971. The New York statute of limitations applicable to the claim against defendant Doubleday is Section 48(2) of the Civil Practice Act relating to actions "to recover upon a liability created by statute" which prescribes a six-

year limitation. Carew v. Melrose Music, Inc., supra.

However, the claim asserted against defendant Sears, having arisen outside New York, will be controlled by the limitations statute of the state in which said cause of action arose if said statute provides a shorter period than that prescribed by the New York limitations statute. The authority for this point is Section 13 of the New York Civil Practice Act, which provides that where a cause of action accrues outside New York and the plaintiff is not a resident of New York, the claim cannot be asserted if barred by the limitations statute of either New York or the place where the cause of action arose. See Walder v. Paramount Publix Corp., D.C.S.D.N.Y., 1955, 132 F.Supp. 912; Winkler-Koch Engineering Co. v. Universal Oil Products Co., D.C.S.D.N.Y., 1947, 79 F.Supp. 1013, 1020; Ansbacher v. New York Trust Company, 280 N.Y. 79, 19 N.E.2d 790; Oglesby v. Cranwell, 2d Dept., 1937, 250 App.Div. 720, 293 N.Y.S. 67.

In order to ascertain where the cause of action arose, it first becomes necessary to consider the nature of the cause of action asserted in the complaint. The Copyright Act grants certain exclusive rights to the holder of a copyright, among which are the rights to print, reprint, publish, copy, and vend the copyrighted work. 17 U.S.C.A. § 1(A). An encroachment upon any one of the aforementioned rights gives rise to a cause of action. Thus, the mere printing or copying of a copyrighted work, without proof of sales thereof, will constitute an infringement. Chappell & Co., Inc., v. Costa, D.C.S.D.N.Y., 1942, 45 F.Supp. 554. And where a party causes or procures an independent contractor to print or copy the work, such party will be equally liable with the independent contractor as a joint tort-feasor. Fishel v. Lueckel, C.C.S.D.N.Y., 1892, 53 F. 499. Moreover, anyone who violates any of the rights secured by the Copyright Act will be liable as an infringer. This point was expressed in American Code Co., Inc.

v. Bensinger, 2 Cir., 1922, 282 F. 829, as follows:

"* * * It is established that the one who prints an infringing work is an infringer. Belford v. Scribner, 144 U.S. 488, 12 Sup.Ct. 734, 36 L.Ed. 514; Baschet v. London Illustrated Standard Co. [1900] 1 Ch. 73. So is the publisher. Baschet v. London Illustrated Standard Co., supra. As likewise is the vendor. Greene v. Bishop, 10 Fed.Cas. p. 1128, No. 5,763." At page 834.

In the case at bar, it appears that within the six-year period the defendant Sears first caused copies of "Woman With A Sword" to be printed by an independent printing contractor in Wisconsin. The printing of an infringing book in Wisconsin would give rise to a cause of action in said state against Sears Roebuck for infringement. Chappell & Co., Inc. v. Costa, supra; Fishel v. Lueckel, supra. Said cause of action would be governed by the Wisconsin statute of limitations which provides a six-year period for "An action upon a liability created by statute when a different limitation is not prescribed by law." Wisconsin Statutes, § 330.19(4).

However, no proof of separate profits to Sears from this printing has been shown. Neither was there proof of any damages. The printer made the profits, not Sears, and the printer was not joined in this action. The most that can be applied here is the "in lieu" clause. 17 U.S.C.A. § 101. In my opinion such damages would be no more than $250. No effective damage took place until publication and sale.

Publication and vending of the books were effected by Sears in Illinois and consequently a cause of action for violation of each of these separate rights would arise in Illinois, if, in fact, an infringement had occurred. Plaintiff contends that the vending of the books by Sears occurred in each state in which it offered them for sale to the members of its book club. Although the word "vend" may include the act of offering

for sale, a mere offer without more does not constitute vending. See Minter v. Williams, 111 Eng.Rep. 781, 4 Adol. & El. 63. In any event, the offer of sale emanated from Illinois and the sales were consummated in Illinois when Sears mailed the books to its members F. O. B. Chicago. City of Chicago v. DiSalvo, 302 Ill. 85, 134 N.E. 5; People ex rel. v. Hill Top Metals Mining Co., 300 Ill. 564, 133 N.E. 303. Consequently, Sears' alleged violation of plaintiff's rights to publish and vend her book gave rise to a cause of action in Illinois and is controlled by the Illinois statute of limitations, which prescribes that "Actions * * * to recover damages for an injury done to property, real or personal * * * and all civil actions not otherwise provided for, shall be commenced within five years next after the cause of action accrued." Illinois Revised Statutes, Chap. 83, § 15.

*(A) As to Doubleday*

■ Since the action was started on July 21, 1954, the six-year statute of limitations applies as to Doubleday, and all of its publications in question are within this statute.

Doubleday's offices were in New York in 1948 (Minutes, p. 1285). The contract between Doubleday and People's Book Club, Inc. (Exhibit 4) was negotiated in New York City (Minutes, p. 1285). The contracts with Doubleday were signed in New York by Doubleday and in Chicago by People's Book Club, Inc. (Minutes, p. 1287).

*(B) As to Sears*

The Sears or People's Edition of "Woman With A Sword" (Exhibit 27) was printed in Wisconsin by the Wisconsin Cuneo Press (Minutes, pp. 1285–1286), on the following dates:

Began presswork ..............................'. .July 22, 1948
Completed presswork ............................August 12, 1948
Started shipping to Chicago (John F. Cuneo Company, Bindery) ......................July 27, 1948
Completed shipment to Chicago ................... August 13, 1948
(see Exhibit CCCC)

The printing was all completed by August 20, 1948 (Minutes, pp. 1288–1289). Cuneo was totally independent of Sears (Minutes, p. 1314). The plates used by Cuneo Press were furnished by Doubleday (Minutes, p. 1316). The sheets were bound by Cuneo in Chicago and the printed books delivered to the People's Book Club, Inc. in Chicago (Minutes, p. 1286). The Club shipped from its Chicago warehouse as directed by Sears (Minutes, p. 1286). The binding, receipt of the orders and shipment of the orders, and the preparation of the promotion matters, including membership promotions in the People's Book Club, were all done in the State of Illinois (Minutes, pp. 1291–1293).

As to Sears, with the application of the five-year statute, all sales before July 21, 1949 would be eliminated from the profits recoverable by the plaintiff. Therefore, we must deduct the sale of 28,311 books from the total of 32,996 books sold through November, 1955 (see Exhibit 26). The ratio of books sold within the five-year period, i. e., 4,685 books to the total books sold by Sears, is 14.2%. 14.2% of $12,297.70, the total profits shown, is $1,746.27. This may be subject to correction to some extent by reason of change in prices of books sold. However, as it hereinafter appears, this question becomes academic.

Consequently, on the assumption of liability and before consideration of the doctrine of apportionment, the recovery would be limited as follows:

(1) For printing only ......$    250.00
(2) Sears' profits ..........  1,746.27
(3) Doubleday's profits .....  15,971.03
Total .......$17,967.30

Infringement

Since none of the affirmative defenses are complete, we next come to a consideration of the merits of plaintiff's claim.

The gravamen of plaintiff's action is the alleged unlawful copying from her copyrighted book concerning the story of Anna Ella Carroll. Access to the plaintiff's book is admitted. However, the mere fact of access is not fatal to a defense in a copyright case. Sheldon v. Metro-Goldwyn Pictures Corporation, D.C.S.D.N.Y., 1934, 7 F.Supp. 837, reversed on other grounds 2 Cir., 1936, 81 F.2d 49, certiorari denied 298 U.S. 669, 56 S. Ct. 835, 80 L.Ed. 1392.

It is well settled that the facts concerning the actual life of an historic character are in the public domain and are not entitled to copyright protection. See Toksvig v. Bruce Pub. Co., 7 Cir., 1950, 181 F.2d 664 (Hans Christian Andersen); DeAcosta v. Brown, 2 Cir., 1944, 146 F.2d 408, certiorari denied Hearst Magazines v. DeAcosta, 325 U.S. 862, 65 S.Ct. 1197, 89 L.Ed. 1983 (Clara Barton); Lake v. Columbia Broadcasting System, D.C.S.D.Cal., 1956, 140 F.Supp. 707 (Wyatt Earp). However, the fictionalizing of events and incidents in the life of an historic figure is the author's original treatment of the life of such figure and is subject to protection against appropriation by others. DeAcosta v. Brown, supra. In such case, however, the copyright does not protect the entire work but extends only to those matters which are the result of the author's independent labor, skill and ingenuity. See Sheldon v. Metro-Goldwyn Pictures Corporation, 2 Cir., 1936, 81 F. 2d 49, certiorari denied 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392.

The fact that two works relate to the same subject matter or are similar to one another does not constitute an infringement if each is the fruit of the author's independent intellectual effort. This is especially true when both works are derived from common sources and materials available to all so that the resemblances are either accidental or result from the nature of the subject. Funkhouser v. Loew's Inc., 8 Cir., 1953, 208 F.2d 185, certiorari denied 348 U.S. 843, 75 S.Ct. 64, 99 L.Ed. 664; Hartfield v. Peterson, 2 Cir., 1937, 91 F.2d 998;

Chautauqua School of Nursing v. National School of Nursing, 2 Cir., 1916, 238 F. 151; Sampson & Murdock Co. v. Seaver-Radford Co., 1 Cir., 1905, 140 F. 539; Ziegelheim v. Flohr, D.C.E.D. N.Y., 1954, 119 F.Supp. 324; Shulsinger v. Grossman, D.C.S.D.N.Y., 1954, 119 F. Supp. 691; Maddux v. Grey, D.C.S.D. Cal., 1930, 43 F.2d 441; Kennerley v. Simonds, D.C.S.D.N.Y., 1917, 247 F. 822; Simms v. Stanton, C.C.N.D.Cal., 1896, 75 F. 6.

Copyrighted work based on material in the public domain then can be infringed only when so transformed by the first taker as to entitle him to a claim of originality. American Code Co., Inc. v. Bensinger, 2 Cir., 1922, 282 F. 829 834; Hirsch v. Paramount Pictures, Inc., D.C.S.D.Cal., 1937, 17 F.Supp. 816, 818.

In American Code Co., Inc. v. Bensinger, supra, Judge Rogers wrote:

"If one takes matter which lies in the public domain, or which has been dedicated to the public by publication without securing copyright under the acts of Congress, and, adding thereto materials which are the result of his own efforts, publishes the whole and takes out a copyright of the book, the copyright is not void because of the inclusion therein of the uncopyrightable matter, but is valid as to the new and original matter which has been incorporated therein. It is necessary, however, to keep in mind the distinction between copyrightability and the effect and extent of the copyright when obtained. *The degree of protection afforded by the copyright is measured by what is actually copyrightable in it; that is, by the degree and nature of the original work.*" 282 F. at page 834 (Emphasis supplied.)

Sidney Greenbie in his preface to "Anna Ella Carroll and Abraham Lincoln," written by him and the plaintiff, Mrs. Greenbie, said: "Few facts in history are more thoroughly documented in governmental records than the work of this remarkable woman" [i. e., Anna El-

la Carroll] (see Exhibit AA, preface, p. VII). However, the historical facts contained in government records are not subject to copyright protection since Section 8 of the Copyright Act, Title 17 U.S.C.A. expressly decrees that "No copyright shall subsist * * * in any publication of the United States Government, or any reprint, in whole or in part, thereof * * *." Factual material published and incorporated in official government records for the benefit of the public at large may not be privately appropriated and "taken from that public under the guise of copyright." DuPuy v. Post Telegram Co., 3 Cir., 1914, 210 F. 883, 885.

There is no copyright of facts, news or history. Oxford Book Co., Inc. v. College Entrance Book Co., 2 Cir., 1938, 98 F.2d 688; Davies v. Bowes, D.C.S.D. N.Y., 1913, 209 F. 53, affirmed 2 Cir., 1914, 219 F. 178; Lake v. Columbia Broadcasting System, Inc., D.C.S.D.Cal., 1956, 140 F.Supp. 707; Echevarria v. Warner Bros. Pictures, Inc., D.C.S.D. Cal., 1935, 12 F.Supp. 632. In Echevarria v. Warner Bros. Pictures, Inc., supra, Judge Yankwich stated:

"One cannot build a story around a historical incident and then claim exclusive right to the use of the incident. If originality can be claimed in opposing Aguinaldo to Funston, as the plaintiff claimed in open court, then all the novels, short stories, and dramas written about the Civil War, opposing Grant and Lee, might never have been written after the first one because the author of the first one could have claimed exclusive right to the product." At page 638.

In Lake v. Columbia Broadcasting System, Inc., supra, Judge Mathes said:

"* * * historical facts and events in themselves are in the public domain and are not entitled to copyright protection * * *." 140 F.Supp. at pages 708–709.

In like fashion Special Master Grater in Eisenschiml v. Fawcett Publications, Inc., D.C.N.D.Ill., Eastern Div., No. 53C 1912, April 26, 1956, wrote:

"It is pure superarrogation for one to suggest that he has any proprietary interest in an era of history, particularly a period that is as extensively written about as the Civil War."

The fact that plaintiff's biography was published before the defendant's novel does not give plaintiff a monopoly of the subject matter, since, unlike the law of patents, "mere priority in time does not confer a monopoly." Harold Lloyd Corporation v. Witwer, 9 Cir., 1933, 65 F.2d 1, 17, certiorari dismissed 296 U.S. 669, 54 S.Ct. 94, 78 L. Ed. 1507. The copyright monopoly, if we may call it that, merely gives the copyright possessor the exclusive right to exploit the form of his expression. In Holmes v. Hurst, 174 U.S. 82, 19 S.Ct. 606, 43 L.Ed. 904, Mr. Justice Brown stated:

"The right thus secured by the copyright act is not a right to the use of certain words, because they are the common property of the human race, and are as little susceptible of private appropriation as air or sunlight; nor is it the right to ideas alone, since in the absence of means of communicating them they are of value to no one but the author. But the right is to that arrangement of words which the author has selected to express his ideas." 174 U.S. at page 86, 19 S.Ct. at page 607.

By drawing upon materials and information from sources available to all, an author does not thereby obtain the right to exclude others from using the same materials.

"* * * An author is entitled to copyright, where he has taken existing materials from other writers and arranged and combined them in a new form, if he has exercised skill and discretion, and has presented something new and useful, for his copyright cannot prevent others from using the old materials,

under the rule that the use of old materials is not an infringement." National Institute, Inc. for the Improvement of Memory v. Nutt, D.C. Conn., 1928, 28 F.2d 132, 135, affirmed 2 Cir., 1929, 31 F.2d 236.

In order to establish that Noble's novel, "Woman With A Sword," infringes upon her biography entitled, "My Dear Lady," plaintiff must show that Noble copied from her book rather than having resorted to the original sources available to all. This is a firmly entrenched rubric of copyright law and was clearly expressed by Justice Story in Emerson v. Davies, Mass., 1845, 8 Fed. Cas.No.4,436, p. 615, as follows:

"* * * the true test of piracy or not is to ascertain whether the defendant has, in fact, used the plan, arrangements, and illustrations of the plaintiff, as the model of his own book, with colorable alterations and variations only to disguise the use thereof; or whether his work is the result of his own labor, skill, and use of common materials and common sources of knowledge, open to all men, and the resemblances are either accidental or arising from the nature of the subject. In other words, whether the defendant's book is, quoad hoc, a servile or evasive imitation of the plaintiff's work, or a bona fide original compilation from other common or independent sources." At page 624.

■■ The monopoly which a copyright holder does enjoy is not without its limitations. Since the Copyright Act is intended to afford encouragement to the production of literary works, reward to the owner is a secondary consideration. United States v. Paramount Pictures, Inc., 334 U.S. 131, 158, 68 S.Ct. 915, 92 L.Ed. 1260. Accordingly, subsequent authors, publishers and the general public may use a copyrighted work in a reasonable manner without the consent of the copyright owner on the theory that such use constitutes a "fair use" of the copyrighted material. Loew's Incorporated v. Columbia Broadcasting System, D.C.

S.D.Cal., 1955, 131 F.Supp. 165, affirmed Benny v. Loew's, Inc., 9 Cir., 239 F.2d 532.

■■■ When a book is designed to convey information, a reader is entitled to avail himself of the facts contained therein and may use such information, whether correct or incorrect, in his own literary work, provided that his expression and treatment is distinctly his own and not merely the result of copying from the book. Oxford Book Co. v. College Entrance Book Co., 2 Cir., 1938, 98 F.2d 688. The second author may also adopt the first author's historical ideas and theories since the law of copyright only protects an author's mode of expression and not his ideas. Eisenschiml v. Fawcett Publications, Inc., D.C.N.D.Ill., Eastern Div., No. 53C1912, April 26, 1956; Sheldon v. Metro-Goldwyn Pictures Corporation, 2 Cir., 1936, 81 F.2d 49. "* * * he who puts forth a thing as verity shall not be heard to allege for profit that it is fiction." Davies v. Bowes, D.C.S.D.N.Y., 1913, 209 F. 53, 55, affirmed 2 Cir., 1814, 219 F. 178.

■ The second author may also use the copyrighted book as a means of reference to the original sources, and such use does not amount to a violation of the exclusive rights granted by the Copyright Act. West Publishing Co. v. Edward Thompson Co., C.C.E.D.N.Y., 1909, 169 F. 833. The latitude which is permitted a second author within the pale of "fair use" was stated in Sampson & Murdock Co. v. Seaver-Radford Co., 1 Cir., 1905, 140 F. 539, as follows:

"* * * So, also, it is clear that, under some circumstances and for certain purposes, a subsequent publisher may draw from the earlier publication its identical words, and make use of them. This is peculiarly so with reference to works in regard to the arts and sciences, using those words in the broadest sense, because, with reference to them, any publication is given out as a development in the way of progress, and, to a certain extent, by common consent, including the implied con-

sent of the first publisher, others interested in advancing the same art or science may commence where the prior author stopped. This includes medical and legal publications, in which the entire community has an interest, and which the authors are supposed to give forth, not only for their own pecuniary profit, but for the advancement of science. * * *" At page 541.

██ Of course, it is not necessary that the whole copyrighted work be copied in order to constitute an infringement. The appropriation of a *substantial* portion of another's copyrighted work will result in an infringement. Marks v. Leo Feist, Inc., 2 Cir., 1923, 290 F. 959.

██ Plaintiff has the burden of proving that the novel, "Woman With A Sword," contains a substantial quantity of copyrightable matter which was appropriated from her book, "My Dear Lady." Oxford Book Co., Inc. v. College Entrance Book Co., Inc., 2 Cir., 1938, 98 F.2d 688; Frank Shepard Co. v. Zachary P. Taylor Pub. Co., 2 Cir., 1912, 193 F. 991; Frankel v. Irwin, D.C.S.D. N.Y., 1918, 34 F.2d 142. Generally a defendant's access to a plaintiff's book and a strong similarity or identity between the two works would create an inference of copying. Overman v. Loesser, 3 Cir., 1953, 205 F.2d 521, certiorari denied 346 U.S. 910, 74 S.Ct. 241, 98 L. Ed. 407; Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464; Freudenthal v. Hebrew Pub. Co., D.C.S.D.N.Y., 1942, 44 F.Supp. 754. In such case, the defendant may rebut such inference by proof that said material came from independent sources. Frank Shepard Co. v. Zachary P. Taylor Pub. Co., supra; Stephens v. Howells Sales Co., Inc., D.C.S.D.N.Y., 1926, 16 F.2d 805; O'Rourke v. RKO Radio Pictures, Inc., D.C.Mass., 44 F.Supp. 480. Thus, by establishing a prima facie case of infringement, the plaintiff would shift to the defendant the burden of going forward with the evidence.

The inference of copying does not exist, however, where the similarity between the two works arises because of the nature of the subject matter and the fact that both authors used materials available to all.

"It has been truly said, that the subject of both of these works is of such a nature that there must be close resemblances between them. But the real question on this point, is, not whether such resemblances exist, but whether these resemblances are purely accidental and undesigned, and unborrowed, because arising from common sources accessible to both the authors, and the use of materials open equally to both * * *." Emerson v. Davies, Mass.1845, 8 Fed.Cas. No. 4436, pp. 615, 625.

Although the burden of proof remains with the plaintiff throughout the case, if plaintiff shows that the infringing work contains substantial copyrightable matter which was appropriated from her book, she need not prove that such matter was not derived by the author from sources available in the public domain. Otherwise "This would place the [plaintiff] in the position of proving a negative, which would be quite an impossible burden, and one which is not imposed upon a plaintiff in a copyright case." Stephens v. Howells Sales Co., Inc., supra, 16 F.2d at page 808.

██ I have read plaintiff's book, "My Dear Lady," the book published by the defendants, "Woman With A Sword," I have read the transcript of the testimony taken before me and I have examined and read the various exhibits submitted at the trial. Any similarity between "My Dear Lady" and "Woman With A Sword" stems from the fact that the central figure in both books is Anna Ella Carroll, a woman of historical significance and whose activities are a matter of public record. However, there is ample evidence in this case to cause me to conclude that Noble, in writing "Woman With A Sword," performed independent research and drew upon information and materials from common sources available to all and in the public domain.

Although Noble's access to plaintiff's book, including the sources listed therein, is conceded, I do not believe that plaintiff has shown that he copied a substantial part of the copyrightable material contained in "My Dear Lady."

■ In determining whether substantial and material parts of a copyrighted work have been copied, a variety of circumstances must be considered. "That is to say, the value of the part appropriated; its relative value to each of the works in controversy; the purpose it serves in each; how far the copied matter will tend to supersede the original or interfere with its sale; and other considerations." Carr v. National Capital Press, 1934, 63 App.D.C. 210, 71 F.2d 220. There is no indication that the publication of the Noble book prejudiced the sale of the Greenbie book. The plaintiff's book was not a commercial success, its publication had ceased before "Woman With A Sword" was published. Certainly, therefore, Noble's book did not diminish the profits from "My Dear Lady." Indeed, "Woman With A Sword" did not supersede the objects of "My Dear Lady." Mrs. Greenbie's book was intended as a biography of Anna Ella Carroll (Minutes, p. 179). The plaintiff in an examination before trial stated in effect that she was making *"two jobs"* of it; that "we would simply get on with all the documentary material, and fix the copyright, and then we would work more leisurely and write the more complete and fictionalized story." (P. 330.) The plaintiff never published a fictionalized version. The great discrepancy in sales between "Woman With A Sword" and "My Dear Lady," and the difference in the books themselves, must also be considered. There is no proof that the publication of the defendants' book caused damage to plaintiff by reason of possible inability to market the "Anna Ella Carroll Story" in Hollywood. Such a contention is pure speculation and is based on plaintiff's misunderstanding of the nature and extent of her copyright.

■ Plaintiff has submitted a list of parallel language, incidents, ideas and juxtaposition of words and events contained in both works which she claims tends to point out the alleged infringement (Exhibit 8). It is clear that mere similarity of phraseology does not amount to an infringement since a copyright does not protect words and phrases as such. Lowenfels v. Nathan, D.C.S.D.N.Y., 1932, 2 F.Supp. 73; Lewys v. O'Neill, D.C.S.D.N.Y., 1931, 49 F.2d 603; Bachman v. Belasco, 2 Cir., 1915, 224 F. 817. Moreover, similarities of incidents alone will not constitute an infringement (Lowenfels v. Nathan, supra; Rush v. Oursler, D.C.S.D.N.Y., 1930, 39 F.2d 468), especially when both works are based on common sources and concern events in the life of an historic figure. DeAcosta v. Brown, 2 Cir., 1944, 146 F.2d 408, certiorari denied Hearst Magazines v. DeAcosta, 325 U.S. 862, 65 S.Ct. 1197, 89 L.Ed. 1983. After his book has been published, an author cannot claim literary property in his ideas, sentiments or creations of his mind. This point was stated as follows in Stowe v. Thomas, 23 Fed.Cas. No. 13,514, pp. 201, 206, involving Mrs. Stowe's romance called, "Uncle Tom's Cabin; or Life Among the Lowly":

> "An author may be said to be the creator or inventor, both of the ideas contained in his book, and the combination of words to represent them. Before publication he has the exclusive possession of his invention. His dominion is perfect. But when he has published his book, and given his thoughts, sentiments, knowledge or discoveries to the world, he can have no longer an exclusive possession of them. Such an appropriation becomes impossible, and is inconsistent with the object of publication. The author's conceptions have become the common property of his readers, who cannot be deprived of the use of them, nor of their right to communicate them to another clothed in their own language, by lecture or by treatise."

However, the presentation of parallel incidents in combination with similar phraseology, when considered in the light of admitted access, has been held to be evidence of copying. See Simonton v. Gordon, D.C.S.D.N.Y., 1925, 12 F.2d 116.

■ The basic test of plagiarism is whether the resemblance between the two works in question could be recognized by ordinary observation and not by fine analysis or by argument and dissection by experts. Wiren v. Shubert Theatre Corporation, D.C.S.D.N.Y., 1933, 5 F.Supp. 358, affirmed 2 Cir., 1934, 70 F.2d 1023. Nevertheless, I have fully considered the list of alleged parallelisms which plaintiff submitted at the trial. These points are treated in detail in the appendix which is to be deemed a part hereof.

■ Upon a consideration of all the evidence in this case, it is my opinion that plaintiff has not established that a substantial or material part of the copyrightable matter in "My Dear Lady" was copied in "Woman With A Sword." Accordingly, the defendants are entitled to judgment with costs. However, I believe that plaintiff commenced this action in good faith, and in the exercise of the discretion conferred upon the Court by the Copyright Act, 17 U.S.C.A. § 116, I direct that an allowance for the defendants' counsel fees shall not be awarded as part of the costs. Stein v. Expert Lamp Co., D.C.N.D.Ill., 1952, 107 F.Supp. 60; Cain v. Universal Pictures Co., Inc., D.C.S.D.Cal., 1942, 47 F.Supp. 1013.

The foregoing together with said appendix constitute the Court's Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

## APPENDIX

1. Plaintiff's Claims Concerning Originality of Treatment.

*A. The use of the name Anne Carroll.*

The use of the name "Anne" for Anna is not unusual. Anne is a common shortening of the name Anna. Mrs. Greenbie acquired no copyright in the use of the name "Anne." As a matter of fact, Mrs. Greenbie states that Anne was the name applied to Miss Carroll by her nephews and nieces and by her brother Thomas (see "My Dear Lady," p. XII).

The Greenbies in "Anna Ella Carroll and Abraham Lincoln," published in 1952 (Exhibit AA) state on page 19: "They christened her Anna Ella Carroll. Not that they intended to call her by that mouth-filling name. Anne she was to her family already, and Anne she would always be to her friends." In Note 4 of Chapter I, page 481 of the same volume, the Greenbies state in effect that the fact that the name "Anne" was the form used in the family circle is supported by the correspondence placed with the Maryland Historical Society, particularly the letter from Joseph Polk (appearing on page 166 of the said Greenbie work) and the letter from Miss Carroll's uncle. In Note 5 of Chapter XV, page 489, the Greenbies write: "This is one of several indications that she was known as 'Anne' rather than Anna among her intimates."

*B. The position of the heroine as a secret agent.*

Under the circumstances revealed by the historical records, the use, if so, of the term "secret agent" for Miss Carroll is not unwarranted. She had what in effect were secret missions and she was undoubtedly an agent (see Exhibit V, p. 6). In fact, Mrs. Greenbie states in her book, "My Dear Lady," that Miss Carroll spoke of herself as being in the secret service (p. VII). The plaintiff has no inherent copyrighted privilege to the sole use of this term. Actually it is questionable if there is any use by Noble of the phrase "secret agent" in connection with Miss Carroll.

*C. The romantic personal relationship between Miss Carroll and Judge Lemuel D. Evans.*

As to this feature, it must be candidly stated that the romantic attachment portrayed by the plaintiff in her book is limited. The approach by Noble, on the other hand, is fictional romance rather than friendly acquaintance. The plaintiff's copyright does not preclude another

writer from featuring such a romance. Ideas as such are not protected. Dymow v. Bolton, 2 Cir., 1926, 11 F.2d 690, 691.

Notwithstanding Mrs. Greenbie's previous statement with respect to Evans' marital status, in "Anna Ella Carroll and Abraham Lincoln" (Exhibit AA) on page 442 (Chapter XXXIV) the Greenbies wrote: "Anne remained in Washington pending a decision. The marriage with Evans, who had been named, not Senator, but Chief Justice of the Supreme Court of Texas, was put off." There is no indication that this statement is fiction.

### D. Miss Carroll's circle of friends.

The plaintiff portrays Anne Carroll's Northern friends as including Edward Bates, Thomas A. Scott, Benjamin F. Wade and Edwin M. Stanton. Her Southern friends included Henry Clay, Jefferson Davis and John C. Breckenridge. Noble includes these and many others in the circle. Sarah Ellen Blackwell in her "Life of Anna Ella Carroll" published letters clearly indicating Anne's acquaintanceships with Bates, Salmon P. Chase, Wade, Orville H. Browning, Thomas A. Scott and others. There is nothing unique in the combination of characters portrayed by Mrs. Greenbie. In Chapters VIII, IX and X of "Anna Ella Carroll and Abraham Lincoln" the authors, Mr. and Mrs. Greenbie, discuss Miss Carroll's connections with various figures in the political life of the time, including Thomas Corwin, Clay, Thomas A. Scott, R. J. Walker, Alexander Bache, Jefferson Davis, James Buchanan, Winfield Scott, Caleb B. Smith, Stephen A. Douglas, Millard Fillmore, Edward Everett, Chase, Wade, and others. In Note 1 of Chapter VIII, page 485 of this book by the Greenbies, it is noted: "We have collated material in A's [Miss Carroll's] records and writings about the various personages with whom she was associated with the sketches of them in the *Dictionary of American Biography*." There is no coppyright merely on the association of historical characters with each other when such association is a matter of public record.

### E. The integration of historical events with the personal story of Miss Carroll.

There is an historical basis for much of such correlation. If certain parts are beyond such foundation, they are predicated upon reasonable inferences which may be drawn from historical events. Mrs. Greenbie cannot insist upon a sole right to draw such inferences or to integrate fiction with history. The course of Civil War events has become well known and the integration of these events with the personal story of Anna Ella Carroll, where such integration is factually justifiable, does not thereby preclude others from portraying Miss Carroll in relation to these historical events. No one can copyright historical facts.

### F. The fictionalization of certain climatic episodes in both books.

It is not unusual for authors to fictionalize historical episodes, and when such fictionalization is bottomed on events occurring during our Civil War period, the choice of events, of necessity, will be limited. It is the author's expression and treatment that are accorded copyright protection. The plaintiff has no monopoly on the episodes of history which are reasonably derived from a combination of the life of Anna Ella Carroll and the history of the Civil War period.

### G. "My Dear Lady" incorrectly referred to Miss Carroll's maid as "Milly."

This error was allegedly copied in Noble's book. The fact is that Miss Carroll's first maid was "Milly," that her second maid in middle life was "Leah," daughter of Milly, and that in late life her third maid was also called "Milly" (see Blackwell, Vol. 1, pp. 7–8). There is sufficient factual justification for referring to Miss Carroll's maid as "Milly."

By reason of the doctrine of common sources, the principle of public domain, the lack of originality by the plaintiff and the rule that ideas are not copyrightable, I must conclude that the foregoing claims "A" through "G" do not

spell out an infringement of plaintiff's copyright.

2. Admissions by Plaintiff with Respect to Certain Parallelisms.

*Parallelism No. 10.* The description of Miss Carroll at the Washington House in "My Dear Lady" and the parallel passage in "Woman With A Sword" are matters of fact (E/B/T, p. 923).

*Parallelism No. 13.* The statement about the delivery of the Jefferson Davis Plan to Clay was a *deduction* from documentary statements (E/B/T, p. 878).

*Parallelism No. 19.* On page 100 of the Greenbies' "Anna Ella Carroll and Abraham Lincoln" (Exhibit AA), there is a description of Miss Carroll, which reads as follows: "A striking little thing she was, with her auburn hair, soft blue eyes, warm, sensitive, pretty face, delicate mouth, lovely shoulders veiled in lace, full but small bosom, short little torso, slim waiste—a little petulant and wistful, yet spirited and gay." The Greenbies in Note 8 to Chapter VIII, page 485, state that this description is based on the oil portrait of Anne which hangs in the home of her niece, Nellie Calvert Carroll of Cambridge, Maryland.

*Parallelism No. 22.* Evans' table manners as well as the description of his mind came from Nellie Carroll (E/B/T, p. 956). The family said he had a fine mind (E/B/T, p. 1004).

*Parallelism No. 29.* The education of Anna Ella Carroll by her father, Thomas King Carroll, is set forth by Mr. and Mrs. Greenbie in "Anna Ella Carroll and Abraham Lincoln" on page 25. The authors of this work refer to page 15 of volume I of Blackwell, in which it appears that Miss Carroll as a young girl read substantial and serious literary works, including law. It is also stated by Mr. and Mrs. Greenbie that Anne learned geography and history in a way that was subject to the circumstances and ideals of her upbringing, but was to prove of great importance in time to come. This, so these authors stated in their aforementioned book, was arrived at by carefully analyzing all indications of what she knew and did not know, in her own writings, and collating them with Miss Blackwell's story and with family tradition.

*Parallelisms Nos. 47, 52.* It was an historical fact that Anne Carroll recommended the arrest of the Maryland Legislature for insubordination, and it appears in the second volume of Blackwell (E/B/T, p. 874).

*Parallelisms Nos. 79, 86.* As to the relationship of Evans and Anne, in Chapter XXII, page 281, of "Anna Ella Carroll and Abraham Lincoln," the Greenbies write that Evans "had been assigned to accompany Anne to the West and had joined her on the train at Baltimore." They cite as a basis for this House Miscellaneous Document 179, page 15 (Note 3, page 495). Further, on page 281, it is stated: "With Evans as aide and escort, Anne visited all the army camps west of the Alleghenies and then went to Chicago and thence to St. Louis." (See Note 4 on page 495, which refers to Anne's and Evans' testimony before the House Committee on Military Affairs in 1876, recorded in House Miscellaneous Document 179.)

*Parallelism No. 117.* Mrs. Greenbie's delineation of Anne's business experience was derived from Miss Carroll's book, "The Star of the West," "which was obviously business publicity," plus the fact that Nellie Carroll told Mrs. Greenbie that Anne went away and earned a living by her pen (E/B/T, p. 967). On page 81 of "Anna Ella Carroll and Abraham Lincoln" the authors, Sydney and Marjorie Barstow Greenbie, speak of Anne earning her bread and butter as a writer for the railroads, and in Note 6 of Chapter VII, p. 484, of this work they, in substance, state that the references to people and circumstances in Miss Carroll's letters and writings point to a continuous business connection with individuals and groups interested in railroad promotion, and they further point out one notable piece of railroad publicity in a chapter on the Pacific Railroad in Miss Carroll's, "Star of the West."

*Parallelism No. 126.* The description of Pilot Scott is deduced from his letters (E/B/T, p. 999).

*Parallelism No. 211.* Mrs. Greenbie says Anne seemed to attach herself to one distinguished man after another. She said that the letters in the Maryland Historical Society reveal this fact (E/B/T, pp. 1072–1073).

3. Parallelisms Based on Common Sources and Supported by Independent Research.

Certain of the parallelisms alleged by plaintiff (see Exhibit 8) are clearly based on common sources, which, in my opinion, were consulted by Noble. Extensive references and testimony supplied by the witness Everette Beach Long, a Civil War historical researcher, are strong evidence of this fact. Some of the material in the parallelisms were based on inferences drawn from historical records, or were fair, fictional interpretations of historical facts (see Exhibits V, T). I believe that the following parallelisms can be attributed to independent research, common sources or historical facts and inferences: 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 23, 25, 26 (see Blackwell Vol. 1, p. 4), 27, 28, 29, 30, 31, 32, 33, 37, 38, 42, 43, 44, 45, 46, 48, 50, 51, 52, 58, 59, 60, 61, 62, 64, 66, 69, 70, 71, 72, 73, 76, 77, 78, 79, 80, 81, 82, 84, 85, 86, 88, 89, 91, 92, 93, 94, 95, 96, 97, 101, 102, 104, 105, 106, 107, 108, 109, 111, 112, 113, 116, 117, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 140, 142, 143, 144, 145, 146, 149, 150, 151, 152, 153, 154, 155, 156, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 174, 175, 176, 177, 178, 179 (the charges are factual although the truth may not be entirely correct), 181 (as to background), 182 (background), 183 (background), 184, 186, 187, 188, 189, 190, 195 (partially historic and partially fiction on Noble's part), 196, 197 (basic history), 198 and 199 (see Blackwell, Vol. I, p. 4), 200, 202, 203, 204, 205, 206 and 207 (background), 208, 209, 210, 211, 213, 215, 217, 218, 219, 221, 222, 224, 225, 226, 228, 229 (background), 230, 231, 232, 233, 234, 235.

Parallelisms Nos. 65 and 147 were abandoned at the trial (see Minutes, pp. 76 and 121).

4. Parallelisms Predicated on Alleged Originality of Ideas and Treatment.

As to the following alleged plagiarisms, I conclude that there is no infringement:

"Chapters 2, 3 and 4, pp. 17–41

"18 These consist of explanations and interpretation of the situation established in Chapter 1 of *Woman With a Sword* pp. 1–17, which is the situation established in chapter 8 of *My Dear Lady*, pp. 89–97. These chapters do not advance the story line.

"The explanations and interpretations are derived from pp. 1–89 of *My Dear Lady.*"

Noble's fictional use and adaptation of historical material, especially the meeting between Anne and Evans in Shillington's book store; Evans' confession to Anne while sitting before the fireplace at Castle Haven that he was detailed to investigate her activities; Harry Heyward's visit at the Washington House, clearly distinguishes his chapters 2, 3 and 4 (pp. 17–41) from Mrs. Greenbie's treatment of Anne's activities (pp. 1–89, 89–97).

Accordingly, I do not find any infringement with respect to this claim.

| *Woman With A Sword* | *My Dear Lady* |
| --- | --- |
| "22   p. 21 Evans' manners abrupt but has remarkable mind." | "p. 111 Manners uncouth. 'I love his mind.'" |

Mrs. Greenbie's description of Evans and Anne's feelings toward him are set forth in connection with the fact that Anne's sisters believed that her social

fall was complete because of her association with Evans. This was brought out as follows:

"* * * Though he was the close friend of some of the greatest figures in the new administration, the girls declared him impossible. His manners were uncouth, his clothes without style, his table manners not above reproach. 'You don't love him, Anne?' they cried. 'I do,' said Anne. 'What! Love that creature!' And they proceeded to give a very unflattering inventory of his eyes, nose, and inches. 'But,' said Anne, 'I love his mind!'" ("My Dear Lady," p. 111.)

However, Noble describes Evans and his attractiveness to Anne in connection with the following conversation between Anne and her father, from which it appears that her father liked Evans very much:

"* * * 'Upon my soul, what a little provincial you're turning out to be! You sound as if some trussed-up frontiersman had been placed on your doorstep and you're wondering what the family will think of him. I like him very much. He's intelligent and he's certainly a most striking-looking man. Those eyes are remarkable. I wouldn't care to oppose him in any decision he had finally taken. And, my dear girl, if Mr. Evans is your friend we shall all accept him as such. Isn't that quite enough?'

"She was somewhat annoyed at herself. Of course her family would be hospitable to Evans. What surprised her was her unexpected desire to have them really like him.

"'Don't tease me, Papa. He is so different. And his manners are sometimes abrupt. But I'm told he has a remarkable mind.' She added lightly, with a trace of her usual confidence, 'I hardly know him personally. * * *'" ("Woman With A Sword," p. 21.)

Manifestly, Noble's treatment of this subject differs from Mrs. Greenbie's version and does not constitute an infringement of her copyright.

| Woman With A Sword | My Dear Lady |
|---|---|
| "24 p. 21 The Carroll's cutter, waiting for them, came alongside and they were *rowed* ashore by four *blacks*." | "p. 64 When the steamer was sighted, the *darkies* used to *row* out to it." |

Mrs. Greenbie's phrase, "darkies used to row out to it," was employed in describing the manner in which the hampers of food which "Brother Harry" sent to Castle Haven were transferred from the steamboats to the shore. Noble portrayed Evans and Anne on their first visit together to Castle Haven as having been "rowed ashore by four blacks." There was nothing unique or original in using rowboats to transfer passengers and cargo from the steamboats to the shore.

Plaintiff's contention that the above language constitutes an infringement is groundless.

"Note

"34 Though Harry Heyward who embodies the conflict of Anne with the men of the deep South is a fictitious character created by Noble, the idea and the motivation are to be found on pp. 58–59 of *My Dear Lady* with additions from pp. 62, 76 and 121 of the same book."

"Chapter 6, pp. 52–56

"49 This chapter is pure fiction. However, the general idea of the re-action of the gentlemen of the deep South to the north is to be found on pp. 58–59 of *My Dear Lady*."

Mrs. Greenbie complains that the fictional character, Harry Heyward, embodies the conflict of Anne with the men of the deep South and that Noble carries over this idea and motivation from her book. Actually, the Greenbie material on the above pages consists of a background of common historical facts and characteristics well known by any writer on the Civil War period.

Mrs. Greenbie has shown no basis for infringement merely because Noble created a fictional person, Harry Heyward, upon whom to focus this conflict of views, which was obvious and unoriginal.

"Chapter 5, pp. 41-51
"Note

"35 With Chapter 5 Noble resumes the story line and makes the next advance in the action. This chapter reproduces Chapter 9 of My Dear Lady, which is *purely plaintiff's invention*, with no warrant, so far as the meeting of Anne and Lincoln is concerned, in any document or any oral tradition. Apart from Noble's appropriation of the whole idea of Chapter 9 of My Dear Lady, there are also in Chapter 5 specific instances of borrowing as follows:"

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "36　p. 43 ff. Anne's meeting with Lincoln at the Hotel Willard prior to Lincoln's inauguration." | "p. 100　Anne's meeting with Lincoln at the Hotel Willard prior to Lincoln's inauguration." |
| "39　p. 45　Lincoln surveys Anne with frank curiosity." | "p. 100　With what *curiosity* and interest Lincoln must have smiled down on this little woman." |
| "40　p. 45　He towered over her." | "p. 100 from his great height" |
| "41　pp. 45-46　*References to Lincoln and Anne smiling at each other.*" | "p. 100　When the smile of Abraham Lincoln met the smile of Anne Carroll in greeting, there must indeed have been light in the room." |

Mrs. Greenbie complains in substance because Noble describes meetings of Anne Carroll and Lincoln. She appears to maintain that since she has referred to such meetings, Noble may not. Much of Noble's chapter 5, above mentioned, is historical. Many contacts of Miss Carroll and Lincoln are either historical or are reasonably inferable, or in the case of Noble's narrative, fictionally treated. The fact that Mrs. Greenbie conceived of a meeting between Lincoln and Anne Carroll at the Willard Hotel does not forever preclude Noble or anyone else from portraying such a meeting. Noble's treatment is different.

As to Abraham Lincoln, the Greenbies in their book entitled, "Anna Ella Carroll and Abraham Lincoln," state on page 97: "There is as yet nothing on record to show that Anne and Lincoln knew each other that winter [referring to the

winter of 1847]. *But is it inconceivable that they did not.*" (Emphasis added.)

In the same work, on page 271, the Greenbies write: "Since persons of far less consequence than Anne Carroll had access to the President's office and met him constantly in the most informal manner, it is naive of some historians to question the many indications of her close association with him. The fact is that Anne was a political personage in her own right, and had been so for years before Lincoln came to Washington."

With respect to Anne's attendance at White House receptions, this is described by the Greenbies in "Anne Ella Carroll and Abraham Lincoln" on page 315. In Note 13 to Chapter XXV, page 501, the authors state: "* * * This is one of those assumptions which, in nine cases out of ten, we have found helpful in uncovering documentary evidence. The

family tradition is that she was always at the receptions."

In my opinion, the above claims do not spell out any infringement of Mrs. Greenbie's copyright.

"Chapter 10, pp. 81–89

"67 Insofar as this chapter advances the action and continues the story line. it is founded on Chapter 13, pp. 125–135 of My Dear Lady."

Noble's fictionalized dialogue in his Chapter 10 between Anne, Evans and Thomas A. Scott divulges the following information: Evans informs Anne of the arrest of nine Maryland legislators; of the confusion in Washington with respect to the conduct of the war, and that he had been sent to the West to observe General Fremont. Scott visits Anne and requests her to go to St. Louis, where she has some relatives, and to visit the Mercantile Library, where she could combine her work on her paper defining the war powers of the President with on-the-spot reports of activities there. Scott also asks Anne to "pump" the librarian for information since he is a kinsman of Albert Sidney Johnston, Confederate Commander in the West.

Mrs. Greenbie's Chapter 13 concerns Anne's association with members of Lincoln's cabinet; the military situation; reference to Anne's relatives in St. Louis; Evans' report on the armies in the West and Scott's request that Anne visit her relatives in St. Louis while she prepared her pamphlet concerning the President's war powers under the Constitution. Mrs. Greenbie intimates that

Anne was also under orders to obtain information from the librarian, Mr. Johnston. This point was stated as follows:

" * * * It seemed a long journey for Anne to make just for the purpose of writing a pamphlet for which there was much more material in Washington than in St. Louis. But St. Louis was no frontier village. It had a fine library which was also a civic center and the very stronghold of aristocratic Southern sympathizers, like her uncle's family— the famous Mercantile Library. She could do her research there, with the kind assistance of the librarian, Mr. Johnston. It is a curious coincidence that this Mr. Johnston was a brother of Albert Sidney Johnston, Confederate commander of the armies of the West!" ("My Dear Lady," p. 134.)

Many of the facts contained in the above chapters can also be found in Volume I, Chapter IV and in Volume II, pages 46 and 47, of Sarah Ellen Blackwell's biography of the life of Anna Ella Carroll. Moreover, the facts in these chapters can also be found in other documents (see 44th Cong. 1st Sess., House Misc. Doc. No. 1179, Serial 1706; Carroll, Anna Ella, Plan of the Tennessee Campaign, The North American Review, April, 1886, pp. 342, 343). Noble was free to consult these sources and avail himself of this information. His treatment and expression of these facts is distinguishable from that of Mrs. Greenbie, both in style and in form, and does not infringe upon her copyright.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "68  p. 82  Evans in Anne's room He * * * strode into her parlor, spreading his poncho to dry. He sniffed the flowers, touched her embroidery on the table, and sighed deeply. 'Home, did you say, Miss Carroll. I'll accept that.' " | "p. 271  To Evans, plain soul that he was, coming from a western border where civilization was still a little bleak, there seems always to have been a charm in the frills, the air of womanliness and family affection, which Anne mixed with her most severe military conferences." |

Mrs. Greenbie protests because of Noble's portrayal of the fictional romance

between Evans and Anne Carroll. Certain historical facts indicate acquaint-

anceship and possibly friendship between Anne Carroll and Evans. Inferences and surmises were equally available to Noble as they were to Mrs. Greenbie. The treatment is distinct and does not infringe upon Mrs. Greenbie's copyright.

"Chapter 11, pp. 89–96

"74 This chapter does not advance the story-line, but elaborates the fact that Anne was dispatched to the West with bits and pieces from My Dear Lady. The meeting between Anne and Lincoln, preliminary to her going West, is suggested in My Dear Lady on p. 168, and the idea of secret meetings with Lincoln is hinted at on pp. 151 and 188 of My Dear Lady."

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "75  p. 89 ff. Secret meeting with Lincoln late at night." | "p. 151 end of chapter. 'some intimate inner room where much may have been said and done behind the back of the Muse of History.'"<br><br>"p 188 bottom of the page 'some extraordinary position, so close to the commander-in-chief  *  *  * that East and West came under her purview and were touched by her hand.'" |

The historical background indicates that Lincoln utilized as propaganda the writings of Anne Carroll and it is reasonable to conclude that Anne Carroll conferred with Lincoln. Mrs. Greenbie's reference on page 151, as above stated, is a mere general inference. The description by Noble is fictional, conversational and episodic. There is no doubt that Miss Carroll presented a plan to the Secretary of War and to Lincoln and that Evans went to St. Louis at the same time as, if not with, Anne. The idea of secret meetings with Lincoln, even if original with the plaintiff, is not subject to copyright protection. It is the author's expression of her idea that is copyrightable. Noble's expression of this idea differs from plaintiff's and does not infringe upon her copyright.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "77  p. 91  'The nub of the matter is, Mr. President,' Evans said quickly, 'that there are *no plans*. Nothing but this nebulous outline of a scheme to *force* twelve hundred miles of a great river with a dozen slow craft and a few thousand men.'" | "p. 142  And yet neither Mr. Lincoln nor his generals knew or had in mind any *plan* other than that of *forcing* a passage down the Mississippi, bristling with batteries, while swamps and bayous pierced its banks, affording defense in the rear little less formidable and forbidding." |

The idea that Lincoln did not have in mind any plan other than that of forcing a passage down the Mississippi was certainly not original with Mrs. Greenbie, nor can she claim that the expression of this idea was peculiarly her own. On page 67 of Blackwell, Vol. I, there appears the following statement:

"And yet neither Mr. Lincoln nor his generals knew or had in mind any plan other than that of forcing a passage down the Mississippi,

bristling with batteries that frowned from its bluffs, while swamps and bayous skirted and pierced its banks, affording defenses in the rear little less formidable and forbidding."

The claim of infringement with respect to the above material is without merit.

"Chapter 12, pp. 96–105

"83 This chapter is built on the first two paragraphs of Chapter 14 of My Dear Lady combined with the hints about General Sherman (see p. xiv of the Preface to My Dear Lady).

Mrs. Greenbie gives only hints as to General Sherman in her preface, page xiv, to "My Dear Lady." Both Sherman and Anne Carroll were historical characters. There is nothing which precluded Noble from describing a fictional meeting, with conversation and details, as he has done. I can find no infringement here.

"Chapter 13, pp. 105–111

"87 This chapter is an elaboration of two paragraphs on p. 136 of My Dear Lady, 'When Anne and Evans * * * whose nature they did not know.' "

Mrs. Greenbie, in two paragraphs, states that Anne and Evans were received by Anne's relatives in St. Louis, who regretted that she was a Unionist and who knew that she earned her living by her pen. Noble's Chapter 13 is a fictional account of their arrival in St. Louis; their meeting with Anne's family in the waiting room; dinner with the family at Planters House; Anne's shock upon learning that Harry Heyward was in St. Louis and her fear that he might do something "to ruin Evans' mission when he found out that Lem was with her."

Both authors wrote the above material on the basis of the historical fact that Anne and Evans visited St. Louis and that Anne stayed with relatives there. Noble's embellishment of this matter of public record cannot be said to have been copied from Mrs. Greenbie's book.

"Chapter 14, pp. 111–125

"90 This chapter is founded on Chapter 14 of My Dear Lady, pp. 136–139. There is no documentation for it. The description of the relations of Anne to her uncle's family is purely plaintiff's, and it is her own surmise, without warrant from family tradition, as is that she moved to the Everett Hotel because her aunt and uncle did not like her goings on."

In pages 136–139 of "My Dear Lady," Mrs. Greenbie states that Anne visited the Mercantile Library and talked with Mr. Johnston; that as a Union sympathizer, Anne was a black sheep; that gossip brought back the scandalous facts that Anne and Evans went off together in the direction of the Tennessee and Cumberland Rivers; and that Anne took a room at the Everett Hotel because she must have been in disgrace at her uncle's house.

Chapter 14 of "Woman With A Sword" deals with Anne's conversation with Mr. Johnston at the Mercantile Library; a meeting between Anne, Evans and Captain Eads, who was to supply eight or more gunboats; Eads' explanation of the War Department's phonetic code; dinner at the Carrolls', including Anne, Evans and Harry Heyward; Anne's meeting with Evans late at night to discuss war strategy; and her return to the Carrolls' house, where she was informed by her Aunt Anne and Uncle Charles that Evans was not welcome in their home.

There is an historical basis for the visit by Anne Carroll to her relatives in St. Louis; of her use of the Mercantile Library to obtain material for the legal treatise written for Bates and Lincoln; of her conversations with the librarian; of her stay at the Everett Hotel; and Eads' presence in St. Louis, where he was building gunboats. Whether or not Anne actually stayed with her uncle's family may be inferential, but there is no reason to preclude Noble from placing her in the uncle's home. With respect to this point, the Greenbies in their book,

"Anna Ella Carroll and Abraham Lincoln," say: "Anne spent two happy days at her uncle's, describing Tom and Maggie's house, telling about their baby, and reviving family memories. [etc.]" (P. 282.) Noble expands, fictionalizes, supplies conversations and episodes which make an entirely different treatment of this whole period than that by Mrs. Greenbie. Consequently, I do not believe that Noble's Chapter 14 infringes upon Mrs. Greenbie's copyright.

The idea that Anne moved to the Everett Hotel because of difficulties with her family was obvious in view of the fact that her purpose and activities in St. Louis were contrary to the sentiments of her Southern relatives with whom she visited. Nevertheless, ideas alone are not copyrightable (see pages ——, —— of not copyrightable (see pages 66, 67 of expression of this idea was not copied by Noble.

|  |  |
|---|---|
| *Woman With A Sword* | *My Dear Lady* |

"98 p. 121 She did not enjoy the expressions on the faces of Aunt Anne and Uncle Charles as they watched her drive off with Evans in a closed carriage. Over the years they had come reluctantly to accept the fact that she was a responsible grown woman who worked as any man * * * but they could not swallow such a flaunting of the proprieties."

"99 p. 123 'My dear Anne * * this conduct cannot be accepted.' "

"pp. 136, 138. Apparently Anne's relatives found her interesting, vivid, and charming, but something of a handful. They understood that she earned her living by her pen, which was odd but honorable. * * And besides there was that man Evans * * * Finally Anne committed her crowning indiscretion. She actually went off somewhere with this fellow."

"p. 138 'her uncle's house, where she must have been in disgrace.' "

Much of this material by Noble is fictional. Mrs. Greenbie's narrations are inferable. Noble (page 121) has Anne Carroll driving off in a closed carriage with Evans and has her uncle and aunt thinking "they could not swallow such a flaunting of the proprieties," while Mrs. Greenbie has written: "Finally Anne committed her crowning indiscretion. She actually went off somewhere with this fellow." Mrs. Greenbie refers to Anne not returning to "her uncle's house, where she must have been in disgrace," while Noble has Miss Carroll's aunt saying, "My dear Anne * * * this conduct cannot be accepted." The "idea" of protesting against Evans has already been discussed in connection with Parallelism No. 90.

Ideas are not copyrightable. Noble's treatment of this subject does not infringe upon Mrs. Greenbie's copyright.

"Chapter 15

"100 This chapter further elaborates the situation in St. Louis by expanding bits and pieces from My Dear Lady."

Noble has expanded upon the episode in St. Louis; much of the background is historical; few likenesses exist. Miss Carroll herself reported later that she talked with Mr. Johnston, the librarian at the Mercantile Library:

"At the Mercantile Library in St. Louis, where I went in search of books that I wanted, I met the brother of General Albert Sydney Johnston, who happened to be the librarian, and had read some of my papers in the press. Being the brother of the most famous soldier in that section of the country, I gained from him a great deal of information as to what was expected to be accom-

plished. He had once lived in my vicinity, and readily told me his views on the prospect. This led to a very warm discussion, and drew many into the library to listen. He expressed astonishment that I, a Southern woman, should be working so vigorously against my section, and after all it could amount to nothing; that, by spring, the whole thing would be at an end; Price would have redeemed Missouri, and Buckner the whole of Kentucky; and, before spring, even, the party of peace would be at the front, and demand concessions from your Government or strike for independence. 'Independence, indeed!' said I, 'before spring your boasted independence as a nation will be at an end.' 'How,' said he, 'are you going to reduce the Mississippi?' I looked him in the face, surrounded by his friends, and said, 'yes; before spring all the strongholds in your Mississippi will have vanished as thin air.' They all sneered, and thought me, no doubt, a very foolish calculator. However, Mr. Johnston continued to lend me books, and treated me with due attention. As the brother of Gen. A. S. Johnston, I took note of all he said. I also took notice of the opinions I heard expressed by the various persons whom I met." North American Review, April, 1886, Anna Ella Carroll, Plan of the Tennessee Campaign, p. 343.

I find no infringement here.

"Chapter 16, pp. 133–142

"110 This chapter expands the idea of Evans' love for Anne suggested by plaintiff into a full scale proposal. The two ideas from My Dear Lady are the idea that Anne went down to study the gunboats, and returning from an expedition with Evans she moved to the Everett House because her position was no longer tenable at her uncle's."

There is historical background for the fact that Miss Carroll looked at the gunboats in St. Louis and that, therefore, she must have visited the waterfront. Evans in certain statements refers to his activities in the city and to his conversation with Anne regarding military situations. Mrs. Greenbie said it was obvious that Anne must have been at the waterfront studying the currents and gunboats and that Evans was her obvious escort (E/B/T, pp. 994–995). The romance between Anne Carroll and Evans is treated far differently by Noble than by Mrs. Greenbie. The latter merely hints and suggest vaguely that their association may have had romantic overtones, whereas Noble portrays an intimate love affair, culminating in marriage plans.

Noble's portrayal of Evans' love for Anne does not infringe upon ideas suggested by Mrs. Greenbie since ideas alone are not copyrightable.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "114   p. 141 Removal to Everett House after expedition with Evans." | "p. 138   Removal to Everett House after expedition with Evans." |

Both Mrs. Greenbie and Noble refer to Anne's removal from the home of her aunt and uncle to the Everett House after the expedition with Evans. There may be no historical evidence that Anne sojourned with her relatives, although Mr. and Mrs. Greenbie so state in "Anna Ella Carroll and Abraham Lincoln" (see

above). There is historical evidence that Anne stayed at the Everett House (see Blackwell, Vol. I, p. 62). Mrs. Greenbie conceded that it was fact that Anne move to the Everett House, although she did not know why (E/B/T, p. 992). The idea of the general attitude of the relatives may have been original with Mrs.

Greenbie, but it was fairly inferable from the facts (see comment to Parallelism No. 90).

The above parallelism does not spell out any infringement.

"Chapter 17, pp. 142–149

"115 This chapter is founded on two sentences in My Dear Lady, p. 138 as follows: 'Anne * * * went off somewhere with this fellow [Evans] * * * in the direction of the Tennessee and the Cumberland.' "

There is no historical basis for Anne Carroll going on some expedition up the Tennessee or the Cumberland with Evans. Evans, however, in one of the House Documents (see Exhibit V, p. 82) stated: "I immediately went with her for the purpose of satisfying her and myself as to the feasibility of navigating the Tennessee." There is also the St. Louis talk with the river pilot, Charles M. Scott. A reasonable inference would supply an adequate basis for this trip.

Noble's treatment of this idea is different and does not infringe upon Mrs. Greenbie's copyright.

"Chapter 18, pp. 149–156

"This reproduces material on p. 145 of My Dear Lady."

On p. 145 of "My Dear Lady" Mrs. Greenbie refers to Anne Carroll's prayer as a *humble Christian,* etc. Noble, on page 150, has her recalling a bit of advice her father had given her years ago: "My dear girl, don't ever forget that the solution of a problem, however difficult, may often be found in the first humble person you meet."

The reference to seeking humble advice appears to lead Anne Carroll to interview Charles M. Scott, the river pilot. Noble's idea may be somewhat similar but the fictionalization of the Scott interview is decidedly different than that by Mrs. Greenbie. There is no doubt that Miss Carroll did interview Scott. This much is a matter of history. I find no infringement in this respect.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "118 p. 150 *How Anne found Pilot Scott* Well, she had forgotten. She was now appalled by the fact that not once during her six weeks in St. Louis had she or Evans ever approached the trained pilots of the Mississippi —ff." | "p. 145 ff. *How Anne found Pilot Scott.* It came upon me by inspiration that the sailors * * * the pilots * * * might offer some suggestion." |

This idea is not only unoriginal with Mrs. Greenbie but was stated in substantially the same language in Blackwell, Vol. I, at page 72: "In reflecting upon the dangers of the proposed expedition it came upon me, as by inspiration, that the sailors—the pilots—might offer some suggestion."

With respect to this claim, I believe that the maxim concerning glass houses would be apropos.

"Chapter 19—pp. 156–171

"The chapter reproduces the story of the inception of the Tennessee Plan and Anne's meeting with Pilot Scott specifically as told in Chapter

15 'It Flows the Other Way,' p. 144 of My Dear Lady."

The story of the conception of the Tennessee Plan and Anne's meeting with Pilot Scott is related in Blackwell, Vol. I, at pages 69–73 and is supported by Miss Carroll's article in The North American Review, April, 1886. Noble's novel fills in the fictional details. The phrase, "It Flows the Other Way," may very well have come from a source referred to by Everette Beach Long (see Exhibit V, p. 206, referring to Donald Davidson, The Tennessee, Rivers of America Series, 1946, pp. 16–17). I find no infringement here.

*Woman With A Sword*

"138   p. 194 Bates referred to her as 'the great unrecognized member of Lincoln's cabinet.' "

*My Dear Lady*

"p.   v 'in the card catalogue * * * I came on the * * * notation, "The great [etc.]".' "

---

"139            Note

"There is no record extant of Bates ever having made such a statement. Noble's attribution of this statement to Bates is in the same category as is his attribution to Lincoln, Sherman and Eads of my words, 'It Flows the other way.' "

The phrase, "The great unrecognized member of Lincoln's cabinet," was neither coined by Mrs. Greenbie nor found only in the card index in the Library of Congress. It appears as part of the title to Volume I of Sarah Ellen Blackwell's work on the life of Anna Ella Carroll. The phrase also appears on page 96 of the said book as follows: "About this time Miss Carroll was spoken of by those conversant with her plans as 'the great unrecognized member of Lincoln's Cabinet.' " Edward C. Bates was conversant with Miss Carroll's plans. Consequently, Noble's attribution of this statement to Bates is historically justifiable. I find no infringement here.

---

*Woman With A Sword*

"141   pp. 195–6 The Craddock's reactions to Anne's activities. 'confused', 'impressed' * * * 'upset the household somewhat' Attitude to Evans. 'disapproved' but 'couldn't help liking him.'

*My Dear Lady*

"pp. 252–3 'reticences and avoidances * * * despite objections * * * he [Evans] was making a place for himself in this circle'."

---

Mrs. Greenbie seems to object to Noble's depicting a visit by Evans and Anne Carroll with Anne's sister, Sally Craddock. The treatment is decidedly different; Noble's is fictionalized and expanded. Merely because Mrs. Greenbie depicted a visit by Evans to Anne Carroll's sister's home does not preclude Noble from portraying such a visit. Noble's description of this visit does not infringe upon Mrs. Greenbie's copyright.

"Chapter 23, pp. 200–207

"148   This brief chapter describing an occasion on which Anne goes driving with Lincoln is an elaboration of the words on page 188 of My Dear Lady 'some extraordinary position, so close to the commander-in-chief * * * that East and West came under her purview and were touched by her hand.' (See p. 204 of Woman With A Sword.)"

In "My Dear Lady" Mrs. Greenbie wrote: "But somehow, in the secrecy of her own book, she let her red pencil trace for her own eye a wordless confession of some extraordinary position, so close to the commander in chief in these matters that East and West came under her purview and were touched by her hand." (P. 188.) There is nothing in this quotation from Mrs. Greenbie's book which specifically narrates any meeting between Anne Carroll and President Lincoln. Noble's fiction describes Anne as being taken for a short drive by Lincoln, with certain conversations. There is no merit to plaintiff's claim with respect to the above matter.

### Woman With A Sword

"163   p. 219 'Men and boys had frozen to death * * * after flinging their blankets away in unseasonable heat [etc.].'"

The above facts were reported in substantially the same language by John Fiske in his "The Mississippi Valley in the Civil War" at page 60, where he says: "The weather has been warm, and many of these inexperienced men had forgotten or thrown away their blankets. Now the

### Woman With A Sword

"177   p. 232 *Anne's willingness to to put off recognition.*

The idea that Anne was willing to forego public recognition is neither original nor copyrightable. At page 105 of Blackwell, Vol. I, it is stated: "Strict silence is counselled as absolutely necessary, and Anna Ella Carroll is not the woman to allow a thought of self to interfere with her plans for the salvation of her country." Again, at page 110 of the aforementioned book, Miss Blackwell states:

> "But at the War Department it has been determined that the secret must be kept so long as the war continues, and this noble, silent woman sits in the gallery listening to all this discussion and makes no claim, knowing well the injury that it would be to the national cause if it should be known that the plan was the work of a civilian, and, above all, a *woman*—a creature despised

### Woman With A Sword

"185   p. 240 'You'd better go to the gallery, Anne.'"

### "Note

"There is no record of Anne's being in the gallery during the debate."

### My Dear Lady

"p. 179 'Men marching through muddy country in the warm spring weather had thrown away their blankets * * * that night * * rain and sleet during which some soldiers were frozen to death.'"

temperature dropped to 20 degrees below the freezing point, while the camps were swept by a furious storm of snow and sleet. Many were frost-bitten, some were frozen to death, in others were sown the seeds of fatal disease."

I see no infringement here.

### My Dear Lady

"p. 189   *Anne's willingness to put off recognition.*

and ignored, not even counted as one of 'the people' in the sounding profession made of human rights a hundred years ago."

Plaintiff's claim of copyright infringement with respect to this "idea" is without merit.

### "Chapter 28, pp. 240–246

"184   This chapter is founded on Chapter 20 of My Dear Lady, p. 187 ff. entitled *Who Saved The Country?* There is nothing in the Carroll records which specifically states that Roscoe Conkling's resolution had anything to do with Miss Carroll. Plaintiff's source for this is a study of the markings in Miss Carroll's own copy of the *Congressional Globe*, which was not available to Mr. Noble."

### My Dear Lady

"p. 189 'the quiet, bright-eyed woman in the gallery,' meaning Anne."

Noble's reference to Roscoe Conkling's resolution can be traced to the statement in Blackwell, Vol. I, page 76:

" * * * All hearts were jubilant, and Roscoe Conkling then offered his celebrated resolutions in the House of Representatives to ascertain who it was that had designed these military movements so fruitful in great results; whether they came from Washington or elsewhere; by whom they were designed and what they were intended to accomplish."

Mrs. Greenbie's claim that there is no record of Anne's being in the gallery during the debate is unsubstantiated. At page 110 of Blackwell, Vol. I., it is stated:

"But at the War Department it has been determined that the secret must be kept so long as the war continues, and this noble, silent woman sits in the gallery listening to all this discussion and makes no claim, knowing well the injury that it would be to the national cause if it should be known that the plan was the work of a civilian, and, above all, a *woman*—a creature despised and ignored, not even counted as one of 'the people' in the sounding profession made of human rights a hundred years ago."

And at page 77 of her book Miss Blackwell quotes Anne Carroll as having said:

" * * * 'I was present through it all and could at any moment have satisfied Congress and the world as to the authorship of the plan, but from prudential reasons I refrained from uttering a word. It was decided to refer the question to the Military Committee of the House, and there the matter slept.' "

Accordingly, I conclude that the above claims of infringement are without foundation.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "191 p. 279 'In the strange web she had helped weave, the fate of Johnston shocked her immeasurably * * * her talks with * * Mr. Johnston of the * * * Mercantile Library flashed before her * * * she could not evade a weight of depression, almost guilt.' " | "pp. 213–214 'To Anne * * * remembering her talks with the librarian, in St. Louis * * * there must have come a solemn moment when she realized that it was she who had done this to Johnston.' " |

The reflection of Anne Carroll here may be original with Mrs. Greenbie, but it is a natural inference. The conversations at the Mercantile Library with Johnston, the librarian, are factually recited by Miss Carroll. Noble treats this subject differently. I find no infringement here.

"Chapter 34, pp. 281–285

"This brief chapter is founded on pp. 218–219 of Chapter 23 of My Dear Lady, plus some details from the previous chapter of My Dear Lady."

In Chapter 34, Noble summarizes some of the historical details with respect to the battle of Shiloh, including the fact that Grant and Sherman had been caught by surprise and that Buell disregarded Grant's orders and arrived a day earlier, thereby avoiding a complete disaster. Noble then depicts Evans as describing the bloody battlefield to Anne. Noble also portrays a conversation between Anne, Evans and Colonel McClure, in which McClure states that Lincoln intends to retain Grant in command because "I can't spare this man. *He fights.*"

At pages 218–219 of her book Mrs. Greenbie mentions that Buell saved the situation at Shiloh and that in Congress Lincoln was criticized for not removing Grant. Mrs. Greenbie also states that McClure appealed to Lincoln for Grant's

removal and that Lincoln said, "I can't spare this man. *He fights.*"

The facts concerning the Battle of Shiloh; Grant's drunkenness; Buell's timely arrival; the public demand for Grant's dismissal and the account of McClure's visit to Lincoln to persuade him to remove Grant after the Battle of Shiloh are all matters of public record and history. Noble's treatment of these facts does not infringe upon Mrs. Greenbie's copyright.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "194   p. 286 They (Anne and Evans) snatched a few days together * * * Their refuge was *Trentham with Sally.*" | "p. 251 She could escape now and then from official Washington for visits with her sister *Sally at Trentham.* Often she took Judge *Evans with her.*" |

Here Mrs. Greenbie objects because Noble portrays a visit of Anne Carroll and Evans to Anne's sister, Sally, at Trentham. The fact that Noble has Evans and Anne visit Sally at Trentham does not, in my opinion, constitute an infringement. Trentham, Sally and the elements of geography are not exclusive to Mrs. Greenbie. Moreover, the Greenbies on page 507 (Note 9, Chapter XXX) of "Anna Ella Carroll and Abraham Lincoln" say: "There is a vivid tradition of one or more visits of this type in company with Judge Evans which we find it hard to fit into A's [Miss Carroll's] crowded schedule." Mrs. Greenbie herself stated that Miss Carroll's family admitted that Evans did come several times to the house at Pikesville (E/B/T, p. 846). There is no infringement here.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "201   p. 301 *Reaction of sisters to Anne's going to Baltimore.*" | "p. 39–41 *Re-action of the sisters to Anne's going to Baltimore.*" |

The treatment by Mrs. Greenbie reveals opposition on the part of Anne Carroll's sisters to her removal to Baltimore for a career. The sisters' reaction to this event, as portrayed in Noble's book, is similar, but it is not an unreasonable inference in view of the general attitude in Southern social circles at that time against careers for women. Noble's treatment of this subject does not infringe upon Mrs. Greenbie's copyright.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "212   p. 303 'your next * * * conquest was James Buchanan * * * you thought it quite laughable when he proposed to you. * * * He was devoted to you and could offer you everything.'" | "p. 41 'a whisper had come through to them that Mr. Buchanan was paying their sister some attention, and after all he was a widower and a distinguished man, and, some said, more likely than Clay to be President * * *.'"<br><br>"p. 51 'James Buchanan was her suitor and at one time made her a formal proposal of marriage.'" |

Here Mrs. Greenbie contends that it was an error to name Buchanan as Anne Carroll's suitor and that it should have been Fillmore. It is true that Noble has followed Mrs. Greenbie and utilized Buchanan's name as the suitor. He might very well have utilized someone else, but the mere fact that he selected Buchanan or made an error is not, in my opinion, infringement.

The Greenbies on pages 381–382 (Chapter XXX) of "Anna Ella Carroll and Abraham Lincoln" wrote: "That their brilliant sister Anne who could have married Buchanan, or President Fillmore, or any one of a number of notable men, should take as a friend a lover perhaps, this wild man from off the plains of Texas seemed incredible."

As to Buchanan, Mr. and Mrs. Greenbie in speaking of him and Anne, on page 91 of "Anna Ella Carroll and Abraham Lincoln" state: "On the occasion when Anne met him socially, he paid her such marked attention that a rumor reached her family that he had proposed to her. Her sisters were all agog." In Note 3 of Chapter VIII, page 485, the Greenbies state: "For A's [Miss Carroll's] attitude to Buchanan, see her pamphlet, *Buchanan or Fillmore, Which?* Her nieces still say that he proposed to her twice. We can find nothing to support this, but think that the evidence points to Fillmore as the president who proposed."

Noble's expression of the idea that Buchanan was Anne's suitor does not constitute an infringement.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "214   p. 310 'marked copies of the Congressional Globe with all of Sumner's speeches carefully annotated  *  *  *.' " | "p. 188   'Anne's own copy of *The Congressional Globe*  *  *  * Anne has indicated by various marks the discussions in Congress which, in one way or another, had to do with her work.' " |

Here there appears to be no definite historical proof of Anne Carroll's marking the Congressional Globe (see Exhibit V, p. 144). It might very well have occurred, however, and Mrs. Greenbie herself indicates that it did occur. The treatment by Noble is much different and does not infringe upon Mrs. Greenbie's rights.

| *Woman With A Sword* | *My Dear Lady* |
|---|---|
| "216   p. 312 *Lincoln speaking to Anne.* I only wish *Charles Carroll* might read this." | "p. 227   Chapter *Reply to Sumner* What Lincoln meant by comparing Anne with her kinsman *Charles Carroll.*" |

Lincoln's comparison of Anne with Charles Carroll, as revealed in William Mitchell's letter to Miss Carroll, dated May 13, 1862, was set forth in Blackwell, Vol. I, at page 48, as follows:

"I was there with some seven or eight members of Congress and others, when a note and box came from you with products from Central America. He seemed much delighted and read your letter out to us and showed the contents of the box. He said, 'This Anna Ella Carroll is the head of the Carroll race. When the history of this war is written she will stand a good bit taller than ever old Charles Carroll did.' I thought you might like to hear this."

I find no infringement here.

*Woman With A Sword*

"227 p. 341 'Sherman had ridden out to the river bluff he had tried vainly to storm from the water five months before and remarked to Grant, "Till now I never thought this movement a success. But this is a success if we never take the town." ' "

*My Dear Lady*

"p. 254 Riding out with Grant to the very bluff which five months before Sherman had tried to storm from the river, Sherman said to Grant, 'Till now I never thought your movement a success. But this is success if we never take the town.' "

---

The above language was taken by both authors from John Fiske's, "The Mississippi Valley in the Civil War," wherein at pages 240–241 it is stated:

"Grant was with Sherman this morning, and the two rode out together upon the very bluff which five months before the latter had vainly tried to storm. 'Until this moment,' exclaimed Sherman, 'I

never thought your movement a success. But this is a campaign! This is success, if we never take the town.' Grant took out a fresh cigar and lighted it, smiled, and said never a word."

Manifestly, Mrs. Greenbie cannot claim that her own expression of this event was appropriated by Noble.

---

*Woman With A Sword*

"231 p. 350 'Evans had designated the document.' (The Material Bearing of the Tennessee Campaign)"

*My Dear Lady*

"p. 301 I assign the authorship of this pamphlet to Evans for what I consider good reasons. But it was published anonymously."

---

Mrs. Greenbie cannot claim originality in assigning the authorship of the above-named pamphlet to Evans, since Miss Blackwell says at page 112 of her biography of Anne Ella Carroll:

"Hon. L. D. Evans, justice of the supreme court of Texas, in a pamphlet entitled 'The Material Bearing of the Tennessee Campaign in 1862 upon the Destinies of our Civil War,' shows that no military plan could have saved the country except this, and that this was unthought of and

unknown until suggested by Miss Carroll, who alone had the genius to grasp the situation."

Mrs. Greenbie's claim is groundless.

### 5. Similar Phraseology

The following parallelisms contain similar phraseology which, in my opinion, Noble must have taken from "My Dear Lady." However, I do not believe that this phraseology constitutes a substantial or material appropriation of copyrightable matter:

---

*Woman With A Sword*

"47 p. 47 'I'd arrest them * * You can't bargain or compromise with pirates.' "

*My Dear Lady*

"p. 122 'You can't bargain or compromise with a pack of traitors. Just arrest them.' "

---

Although the above statements are logical inferences from facts in the public domain, Noble's use of the words "bargain or compromise" and "arrest them" in relation to the Maryland legislators strongly suggests that they may

have been taken from Mrs. Greenbie's book since it is conceded that Noble not only had access to her book, but that he used it as a lead to other sources of information.

88

### Woman With A Sword

"53    p. 58  Following the attack on Fort Sumter, * * * the torn administration, representing a divided, *corruption*-ridden, apathetic, *unwieldly* North did nothing but discuss measures."

### My Dear Lady

"p. 113  From the moment Fort Sumter was fired on, the great *unwieldy* country, honeycombed with *corruption* in high administrative places, and with what Anne called treason all along the border, hastened to pull itself together."

The above language from "Woman With A Sword" paraphrases the following two sentences on page 58 of said book:

"For almost three fantastic months following the attack on Fort Sumter, the country and the capital were in an increasing uproar.  The torn administration, representing a divided, corruption-ridden, apathetic, unwieldly North, did nothing but discuss measures to cope with a situation wholly out of control."

The wording from "My Dear Lady" paraphrases the first sentence on page 113, which reads:

"From the moment Fort Sumter was fire on, the great unwieldy coun-

try, honeycombed with corruption in high administrative places and with what Anne called 'treason' all along the border and through the Northwest, hastened to pull itself together."

The statements in both books are predicated on matters of public record.  However, the words "corruption" and "unwieldy" are used by both authors to describe the administration just after the attack on Fort Sumter.  This similarity of phraseology in the expression of substantially the same idea leads me to believe that Noble may have taken these words from Mrs. Greenbie.

### Woman With A Sword

"54    p. 58  On July Fourth the new Congress convened * * * Frightened senators and representatives and *home-folk* * * * awoke to the appalling fact that they were really at war.  Virginia, North Carolina, and Tennessee had now also seceded.  The Army and the Navy had all but dissolved in a flood of resignations as the ablest officers in both services rushed South to fight for their respective states."

### My Dear Lady

"pp. 113–114  On July 4, with the force of the *home-town* folks behind them, a very sober Congress convened to face the fact that this was war.  * * *  Virginia had seceded, followed by North Carolina and Tennessee; a large number of the officers of the Army and the Navy had resigned their commissions and taken up arms against the United States."

Here Mrs. Greenbie's use of the term "home-town folks" is to some extent paraphrased by Noble where he refers to "home-folk."  The convening of Congress on July 4th, the secession of Virginia, North Carolina and Tennessee and the resignation of Army and Navy officers for the purpose of taking up arms

against the Union, are matters of public record and may be used by all who wish to do so.  It is quite logical to combine these facts since they formed the setting for Senator Breckinridge's speeches in Congress, especially his speech on July 16, 1861, in which he strongly attacked President Lincoln's actions.

*Woman With A Sword*

"55 p. 58 Breckinridge was under heavy suspicion * * * *shunned* or treated with *freezing discourtesy* by his colleagues."

*My Dear Lady*

"p. 114 He [Breckinridge] alone lingered, *shunned* distrusted by all loyal men, and treated with the most formal and *freezing courtesy* by his associates."

---

The historical background for these statements appears to be in Leech, "Reveille in Washington" (p. 87), and in Miss Carroll's article in the North Amer- ican Review in April, 1886. However, the phraseology "shunned," "freezing discourtesy," etc. appears to be Mrs. Greenbie's.

---

*Woman With A Sword*

"56 p. 58 And yet a vague fear shook her as she read the words in the Congressional Globe and saw that he was waging a *lone battle against* the whole pack of Unionists, a pack telling him in *words and gestures* that he was *the one yellow dog left among them.*"

"57 John Breckinridge was now a Kentucky senator standing alone among the *black-draped seats* of his Southern colleagues."

*My Dear Lady*

"p. 114 (Breckinridge as the only Southern Senator in the Senate."

"The seats of all his former friends * * * were empty, and the *seat* of Stephen A. Douglas was *draped* in black * * * it is impossible to read the Congressional Globe for those days without a kind of admiration for Breckinridge, returning day after day for his *lone battle with the pack,* refusing to give way, refusing to drop his eyes or lower his high head before men who were telling him in every word and gesture that *he was the one yellow dog left among them,* and they were determined to get him out."

---

The above quotation from Noble utilizes Mrs. Greenbie's phrases with respect to the "lone battle against the pack," "the one yellow dog left among them," and in reference to the seats draped in black.

### Woman With A Sword

"63 p. 71 September ninth was an unforgettable day in her life. That morning when she picked up the Washington Star, Anne had the grim satisfaction of reading the latest news about John Breckinridge. The day before, speaking to a gathering of Kentuckians in Bowling Green, he announced that he was leaving the Senate to enter the Confederate Army. 'I exchange with proud satisfaction,' he had cried defiantly, 'a term of six years in the Senate of the United States for the musket of a soldier.' On that very morning, too, the War Department sent copies of Anne's reply to Breckinridge to all government desks in the capital and to all embassies and consulates abroad."

### My Dear Lady

"p. 118 Breckinridge, pursued by the wrathful replies of many beside Anne, left Washington and went to Kentucky. There, in an address to a gathering of Kentuckians at Bowling Green, on Sept. 8, 1861, he announced that he was leaving the Senate to enter the Confederate Army 'I exchange with proud satisfaction a term of six years in the Senate of the United States for the musket of a soldier.' "

"p. 118 'On Sept. 9, side by side with the newspaper carrying Breckinridge's words, there appeared on hundreds of official desks a copy of Anne's pamphlet.' "

Most of the material here is historical or reasonably inferable from historical events, except that Mrs. Greenbie states that the distribution of the Anne Carroll pamphlet in reply to Breckinridge occurred on September 9, 1861. This is an error—it should have been October 9th since Breckinridge's speech was on October 8, 1861, not on September 8, 1861. Noble accepted this date in Greenbie as factually correct and repeated it in his book. Consequently, he copied an incorrect assertion of fact.

In "Anna Ella Carroll and Abraham Lincoln" (pp. 263–264) the Greenbies refer to a speech by John C. Breckinridge before a gathering in Frankfort, Kentucky, on September 8th, and likewise state that a copy of Anne's Reply to Breckinridge appeared on the desks of thousands of officials on September 9th. No explanation in the notes appears to have been made by the Greenbies, and although no reference to any authorities appears, it is clearly set forth as fact by them.

### Woman With A Sword

"103 p. 126 She and Evans * * would up on the waterfront each evening, gloomily watching the muddy flood of brown water that poured past the city, that seemed to carry with it every conjecture and faint hope they possessed straight into the heart of the Confederacy."

### My Dear Lady

"p. 139 Like one fascinated, she returned day after day to the river * * * somberly watching the dark brown current swirling against the docks * * * Hopelessly she looked at that mighty flood of tawny water, rolling away down there into the heart of rebeldom."

The above phraseology used by Noble appears to have been copied to some extent from Mrs. Greenbie. However, Mrs. Greenbie did say that it was obvious that Anne must have been at the waterfront studying the currents and gunboats and that Evans was her escort (E/B/T, pp. 994–995).

### Woman With A Sword

"157 p. 207 The upheaval in the War Department Building was as nothing to the storm that raged through the corridors of the Capitol and the columns of the *Northern press* over Stanton's abrupt and astonishing appointment. Lincoln's official acceptance * * * was a *puzzle* no one could solve."

### My Dear Lady

"p. 170 Stanton's appointment amazed almost everyone and has *puzzled* historians ever since * * * *The New York Times* praised the appointment * * * Among Republican leaders there was much discontent."

---

Both of the above statements are factually correct. However, Noble's characterization of Stanton's appointment as a "puzzle" appears to have been taken from Mrs. Greenbie's expression of the enigma surrounding the appointment.

---

### Woman With A Sword

"172 p. 231 'Fifty thousand celebrating citizens stormed the Mercantile Library where she had worked so quietly, and set off rockets and cannon and read the Declaration of Independence and the Preamble to the Constitution.' "

### My Dear Lady

"p. 183 '50,000 persons marched in procession to the Mercantile Library. Not one of that great crowd knew how, a few months before Anne had * * * teased out of the librarian * * * a knowledge of the trail over which they had marched to * * * victory * * * They sang the national anthem and read * * * Washington's Farewell Address.' "

---

Noble's reference to 50,000 citizens appears to be copied from Mrs. Greenbie's statement. The defendants do not refer to any source stating such a number. In a dispatch from St. Louis appearing in the New York Times on February 18, 1862, the number is given as 1,200 to 1,500. At the trial of this case, Mrs. Greenbie testified that the facts came from some newspapers (Minutes, p. 136). In her examination before trial she said: "It is a matter of historical record that on that day—you can read at least two hundred fifty accounts that read very much like this of what happened with bonfires, rockets, the reading of something, and the general being enthroned in glory." (P. 884.)

The celebration in St. Louis of the fall of Fort Donelson is described by the Greenbies on page 316 (Chapter XXV) of "Anna Ella Carroll and Abraham Lincoln," where reference is made to 15,000 persons "cheering for the U. S. A. [etc.]." Likewise, reference is made on page 318 that in St. Louis 50,000 persons marched in a procession to the Mercantile Library. Although there is no authority stated for these facts, neither is there any statement that they are "synthetic," as termed by the Greenbies in certain other instances.

I do not believe that the use of this number (50,000) is a substantial appropriation.

*Woman With A Sword*

"173   p. 231 Mr. Stanton, a wry expression on his face, *filed away* the Army's angry charges on Grant's debauchery at Cairo * * * and sent Grant's name to the President nominating him for major-general."

*My Dear Lady*

"p. 181   The Secretary of War filed away the charges of Grant's drunkenness, sent his name to the President for nomination to the rank of major-general."

---

The promotion of Grant despite his known intemperance is a matter of historical fact. Nevertheless, the juxtaposition of the promotion with charges concerning Grant's drunkenness and the statement that Stanton "filed away" the charges and then submitted Grant's name for promotion, closely parallels Mrs. Greenbie's expression of this idea.

*Woman With A Sword*

"180   p. 235 'She wants the Speaker of the House to lead Miss Carroll out on the House rostrum * * * and announce "Gentlemen, here she is.  This is the sole author of the Tennessee campaign." ' "

*My Dear Lady*

"p. 189   'Wade was for taking Miss Carroll by the hand and leading her right out in front of Congress and saying, "Here she is. Here is your man." ' "

---

Although the above language is similar, the common source for both statements appears to be Judge Wade's remarks to Senator Wilson on May 31, 1862, and reported in Blackwell, Vol. I page 118, as follows: "[Wade] only regretted that he was not in the Senate then on this very account, and would always be *sorry that he had not induced Miss Carroll to come out and make her claim for her rights * * *.*" (Emphasis added.)

*Woman With A Sword*

"192   p. 281 'For three days the endless lists of dead, dying, wounded, and missing poured into the homes of the people. And then these people rose in their fury, and the *fury of the land broke on Grant.*' "

*My Dear Lady*

"p. 218   'As all over the country household after household went into mourning for the sons, fathers, the sweethearts and husbands dead on the field at Shiloh, *the fury of the land broke on Grant.*' "

---

The facts in the above statements are drawn from history, but Noble appears to have appropriated some of the phraseology from Mrs. Greenbie.

*Woman With A Sword*

"220   p. 319 'Braxton Bragg, striking northward in a series of brilliant raids, threatened to reconquer all Tennessee and Kentucky, and threw fear into every state north of the Ohio.' "

*My Dear Lady*

"p. 240   'Braxton Bragg, in a series of brilliant raids, was threatening the reconquest of Tennessee and Kentucky, and throwing scare after scare into the states north of the Ohio.' "

---

The similarity of the above language suggests that Noble borrowed the phraseology from Mrs. Greenbie in order to describe the raids of Braxton Bragg.

"223 p. 323 'Statements from the West,' said Evans, 'that *make the Potomac look like some peaceful river in Paradise.'*"

The statement about the Potomac looking like some river in Paradise appears

"p. 242 'Situation on the Mississippi which *made the* Potomac and its squabbles *look like the river of a peaceful Paradise.'*"

to be copied by Noble from Mrs. Greenbie.